IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

FELICE JOHN VEACH,
     Petitioner,

vs.                          Case No. 3:06cv482/MCR/EMT

WALTER A. McNEIL,[1]
     Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus, filed under 28 U.S.C. § 2254 (Doc. 1). Respondent filed an answer to the petition with relevant portions of the state court record, and Petitioner filed a reply (Docs. 10, 16).

The matter is referred to the undersigned magistrate judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 10, Exhibits). Petitioner was charged by an amended information in the Circuit Court in and for Escambia County, Florida, with one count of Lewd and Lascivious Assault Upon a Child Under the Age of Sixteen between January 1, 1999, and April 4, 1999, and one count of Lewd and Lascivious Sexual Battery Upon a Child Under the Age of Sixteen on April

---

[1] Walter A. McNeil succeeded James McDonough as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d)(1).

4, 1999 (Doc. 10, Ex. A at 2).[2] Following a jury trial, Petitioner was found guilty as charged (*id.* at 7; Exs. B, C). On January 24, 2000, Petitioner was adjudicated guilty and sentenced to a fifteen-year term of imprisonment on each count, to run concurrently (Ex. A at 24–25, 49–54).

On February 21, 2000, a Notice of Appeal was filed on Petitioner's behalf (*id.* at 57). Petitioner's appeal, however, was delayed due to miscommunications between Petitioner and his appellate counsel (*see* Doc. 10 at 2; Ex. D). Ultimately, the Florida First District Court of Appeal ("First DCA") permitted the filing of a belated appeal on Petitioner's behalf (*see* Doc. 10 at 2–3; Ex. K). Veach v. State, 854 So. 2d 261 (Fla. 1st DCA 2003). The First DCA affirmed Petitioner's conviction and sentence, per curiam, on December 10, 2004, with the mandate issuing December 28, 2004 (Ex. N; Ex. P, Attach.). Veach v. State, 888 So. 2d 171 (Fla. 1st DCA 2004).

On December 17, 2004, Petitioner filed a Notice to Invoke the Discretionary Jurisdiction of the Florida Supreme Court, seeking review of the First DCA's per curium affirmance of his conviction and sentence (Exs. O, P). Petitioner later filed a Notice of Voluntary Dismissal (Ex. R), and in an order issued March 14, 2005, the Florida Supreme Court dismissed Petitioner's petition for review (Ex. S). Veach v. State, 900 So. 2d 556 (Fla. 2005) (Table).

On April 25, 2005, Petitioner filed in the trial court a Motion for Post-Conviction Relief pursuant to Florida Rule of Criminal Procedure 3.850 (Ex. T at 1–32). The trial court summarily denied the motion in an order filed November 23, 2005 (*id.* at 33–54). On December 12, 2005, Petitioner filed a Motion for Rehearing (*id.* at 162–67), which was denied by the trial court in an order filed January 10, 2006 (*id.* at 168). On January 19, 2006, Petitioner appealed the denial to the First DCA (*id.* at 169–70; Ex. U). The First DCA affirmed, per curiam, on May 26, 2006, with the mandate issuing June 21, 2006 (Ex. W). Veach v. State, 930 So. 2d 626 (Fla. 1st DCA 2006) (Table).

Petitioner filed the instant petition on October 25, 2006 (Doc. 1). Respondent concedes that the petition is timely but asserts that Petitioner is not entitled to relief (Doc. 10 at 1–2). Specifically, Respondent contends that the claims raised by Petitioner in Grounds One through Nine should be

---

[2] Hereafter all references to exhibits in this Report and Recommendation will refer to the exhibits filed by Respondent with his answer to Petitioner's habeas petition (i.e., Doc. 10, Exhibits).

denied on the merits, and the claim raised in Ground Ten should be denied because it is procedurally defaulted, or alternatively, without merit (*id.* at 2, 33–36). In his reply, Petitioner asserts that Ground Ten is not procedurally defaulted, and he has provided additional argument in support of Grounds Two, Five, and Ten but declined to further address Grounds One, Three, Four, and Six through Nine, relying instead on the arguments in support of those claims as presented in the Section 2254 petition (*see* Doc. 16).

## II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3] The appropriate test was described by Justice O'Connor as follows:

---

[3] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."

Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

　　If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion."  Williams, 529 U.S. at 410–12.

　　Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

　　When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the

petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 496 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 496 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

## III.    EXHAUSTION AND DEFAULT

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States."

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[4] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal

---

[4] Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
  (A)  the applicant has exhausted the remedies available in the courts of the State; or
  (B) (i)  there is an absence of available State corrective process; or
   (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.* at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Id.* (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. *Id.* at 7 & n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in <u>Duncan</u>, 513 U.S. at 364.  The <u>Duncan</u> Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[5]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  <u>Id.</u> at 365–66. Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  <u>Baldwin v. Reese</u>, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  The <u>Baldwin</u> Court commented that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  <u>Id.</u>, 541 U.S. at 32.  With regard to this statement, the Eleventh Circuit stated in <u>McNair v. Campbell</u>, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" <u>McNair</u> [<u>v. Campbell</u>], 315 F. Supp. 2d at 1184 (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

---

[5] The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

416 F.3d at 1302–03 (citations omitted).[6]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* Coleman v. Thompson, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 2555 & n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id.* A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir.

---

[6] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[7] *Id.* Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

A petitioner can overcome a procedural default in two narrow circumstances. The petitioner must either show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Henderson v. Haley, 353 F.3d 880, 892 (11th Cir. 2003); Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. Tower, 7 F.3d at 210. Furthermore, the Eleventh Circuit has held that because there is no constitutional right to an attorney in state postconviction proceedings, any ineffectiveness of postconviction counsel cannot be "considered cause for the purposes of excusing . . . procedural default that occur[s] . . . at the state collateral post-conviction level." Henderson, 353 F.3d 892 (citing 28. U.S.C. § 2254(i); Coleman, 501 U.S. at 752; In re Magwood, 113 F.3d 1544, 1551 (11th Cir. 1997); Johnson v. Singletary, 938 F.2d 1166, 1174–75 (11th Cir. 1991)). To establish prejudice, a petitioner must show that there is "at least a reasonable probability that the result of the proceeding would have been different." *Id.*

Alternatively, to satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the

---

[7] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. Marek v. Singletary, 62 F.3d 1295, 1301–02 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further,

> [A] substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

IV.    TRIAL EVIDENCE

A summary of the relevant trial evidence adduced at Petitioner's trial provides a helpful context in reviewing Petitioner's claims. Tina Louise Smith was the first witness to testify. She testified that between January and May 1999 she visited her ex-boyfriend, Mickey Parker, every weekend, and she brought her children with her when she visited him (Ex. B at 66–67). During Ms. Smith's visits her children sometimes played at a house next door to Mr. Parker's house, and there they met a boy named "Chris" who was approximately thirteen or fourteen years old (*id.* at 68). The children sometimes played on a dock that was behind the house next door, where Mr. Parker kept his boat, or they swam near the dock (*see id.* at 68–69). Ms. Smith occasionally observed her children spending time with and swimming with Chris and Petitioner, who she knew as "Rocky" (*id.* at 67–70). Ms. Smith testified that her daughter, the alleged victim (referred to hereafter as "C.A."), had a crush on Petitioner (*id.* at 70). Ms. Smith also testified that some time before April 4, 1999, she discussed her daughter's crush with Petitioner, and Petitioner stated that he thought C.A. had a crush on him (*id.*). Ms. Smith advised Petitioner that "there was no possible way that anything would ever happen because she [C.A.] was only 13 years old and he [Petitioner] was 28" (*id.*). Ms. Smith next testified that she and her children visited Mr. Parker the weekend of April 4, 1999 (*id.* at 70). Following this visit (some time during the middle of May 1999) she found an address book that belonged to C.A.'s younger sister (referred to hereafter as "T.A."), and in the book T.A. had written a note stating that C.A. had sex with Rocky on or about April 4, and she (T.A.) was upset and mad at C.A. (*id.* at 71). Ms. Smith confronted C.A. with the information, but C.A. denied having sex with Petitioner; Ms. Smith then confronted T.A. with the information, and T.A. said it was true, and she knew it was true because she saw Petitioner having sex with C.A. (*id.*). Ms. Smith

then confronted C.A. a second time, and on this occasion C.A. admitted that it was true (*id.* at 72). Following C.A.'s admission Ms. Smith called the police (*id.*).

On cross-examination Ms. Smith testified that she did not show law enforcement officers the entry in T.A.'s address book because it had been ripped out by one of her daughters (*id.* at 76). She also testified that C.A. was not examined by a Child Protection Team pediatrician (*id.* at 78–79). Lastly, Ms. Smith testified that there was a boat on a trailer in front of Mr. Parker's house that the children sometimes played on, but she never saw "anything happening on that boat" (*id.* at 80).

T.A. was the second witness to testify (*id.* at 81). In relevant part she testified that Mr. Parker had a houseboat that was tied to the dock behind the house next door (*id.* at 83). During the weekend of April 4, 1999, which was Easter weekend, she, Rocky, Chris, and C.A. were swimming, and she overheard Rocky tell C.A., "You know what we're going to do tonight," but she did not know the meaning of his statement (*id.* at 84). She also testified that one night during the Easter weekend, she, Rocky, Chris, and C.A. went onto the houseboat without Ms. Smith's knowledge, and after they got inside the houseboat, Rocky told T.A. and Chris to go outside and wait (*id.* at 85–86). T.A. and Chris went outside, and Chris had a flashlight (*id.* at 86–87). T.A. stated that there was a hatch on the top of the houseboat, and when she looked down inside the hatch using the flashlight, she could see Rocky, and he was naked (*id.*). She stated that she then went to the back of the houseboat and looked through a door, and at that time she could see Rocky, who was still naked, "going up and down between [C.A.'s] legs" (*id.* at 87–88). She testified that C.A. was wearing a dress, but it was up on her waist (*id.* at 88). T.A. then went back on the top of the boat but returned to the area of the door to look inside the houseboat again (*id.* at 88–89). When she looked inside Rocky was "still going up and down," and C.A. had her "legs spread" (*id.*). T.A. got off the boat to go back to the house, at which time Chris told her to "not tell on her sister or she'll hate [T.A.] for the rest of her life" (*id.* at 90). T.A. also testified that only she looked in the boat; Chris did not look (*id.* at 97). T.A. next testified that she did not tell her mother what she had seen, but she wrote what she had seen in "a little diary" (*id.* at 91). T.A. further testified that her mother found the diary and asked her about the diary entry, at which time T.A. told her mother that she had seen C.A. and Rocky "going up and down" (*id.*). Lastly, T.A. confirmed that the person she knew as "Rocky" was Petitioner, and she identified Petitioner in the courtroom (*id.* at 92).

On cross-examination T.A. testified that Chris was C.A.'s boyfriend at the time C.A. had sex with Petitioner, and that Chris was not C.A.'s first boyfriend (*id.* at 93). T.A. also acknowledged that although she still had her diary, the pertinent diary entry was missing, but T.A. stated that she did not take the note out of the diary, and she did not know who might have done so (*id.* at 95–96).

C.A. was the next witness to testify. In relevant part she testified that she met Rocky and Chris during her mother's weekend visits to Mr. Parker's house, and they swam together "and talk[ed] and stuff" (*see id.* at 97–100). She stated that Rocky flirted with her, and when they went swimming he grabbed her "butt and [] breasts," and "sometimes" she told him to stop (*id.* at 100–01). She testified that during the Easter weekend of April 4, 1999, Rocky told her, "you know what we're going to do tonight," but she did not know what his statement meant (*id.* at 103–04). She further stated that on the Saturday night of Easter weekend she and T.A. "snuck out" to meet Rocky and Chris on the houseboat (*id.* at 102–03). She stated when she got on the boat Rocky asked her if she "wanted to do it" (*id.* at 104). C.A. knew what Rocky meant by this question, and she told him "yes," she wanted to have sex with him (*id.*). She also testified that she wanted to have sex because she was "curious" and was a virgin (*id.* at 103–04). C.A. testified that she took off her underwear and pants and got on a bed; Rocky then took off his clothes and got on top of her (*id.* at 104). Rocky asked C.A. if she wanted him "to stick his penis in" her, and she said no, but he did anyway, and they had intercourse (*id.* at 105–06). She told Rocky to stop because it hurt, but he told C.A. that pain was typical, and he did not stop (*id.* at 106). C.A. also testified that Chris and T.A. had gone on the top of the boat to look at the stars, but during the intercourse they were looking at her and Rocky (*id.* at 105–06). T.A. began to cry and ran off, and at that point C.A. pushed Rocky off and ran after T.A. (*id.* at 106). C.A. did not tell her mother about the sexual encounter right after it happened, but approximately one month later her mother questioned her about the entry in T.A.'s diary (*id.* at 107). Upon being questioned C.A. initially denied having sex with Rocky because she was scared, but after T.A. told their mother that it was true, C.A. admitted it (*id.* at 107–08). Like her sister, C.A. identified Petitioner as the person she knew as Rocky (*id.* at 109).

On cross-examination C.A. testified that she had boyfriends before the incident with Rocky, but she denied that T.A. disliked her having boyfriends (*id.* at 110). She also testified that she had

seen the note written by T.A. about her encounter with Rocky when her mother showed the note to her, but she did not know what happened to the note (*id.* at 113).

Paula Culver was the next witness to testify. She testified that she was Petitioner's "ex-sister-in-law," and that she became involved in a relationship with Petitioner in May 1999 (*id.* at 120–21). She also testified that in May 1999 it came to her attention that a criminal investigation was underway regarding Petitioner, and she was informed of the allegations (*id.* at 121). She confronted Petitioner about the allegations, and in response he told her "he had slept with a little girl" on a boat by his mother's house (*id.* at 22). On cross-examination Ms. Culver admitted that she did not advise law enforcement of Petitioner's confession until after her relationship with Petitioner ended and, apparently, after Petitioner started seeing another woman (*see id.* at 123). No additional testimony was offered by the State.

Defense counsel acknowledged that no good faith basis existed to move for a judgment of acquittal on Count Two, the sexual battery charge, but he moved for a judgement of acquittal on Count One, the lewd assault charge, which was denied (Ex. B at 124).

The first defense witness was Bobbie Jean Abernathy. In summary, she testified that Petitioner is her brother, that in April 1999 Petitioner lived with their mother (Jeanie Bowen), and that her children (Christopher "Chris" and Andrew, Petitioner's nephews) occasionally stayed with Ms. Bowen, but Christopher did not stay with Ms. Bowen and was not there during the Easter weekend in April 1999 (*see id.* at 130–33). Ms. Abernathy testified that she remembered the Easter weekend because on the Friday of that weekend she and others went to Pensacola Beach (*id.* at 130–31). While at the beach Chris followed his older brother (Andrew) out to the surf and got caught in an undertow, and when she went to help Chris she got caught too, so her ex-husband had to rescue both of them (*id.* at 131). Ms. Abernathy testified that she and Chris "hurt" the next day due to water in their lungs "and stuff," so they spent Saturday at home (*id.* at 131). On Saturday evening she took Andrew to spend the night at Ms. Bowen's house, but Christopher stayed home and did not go out (*id.* at 131–32). On Easter Sunday morning she went to church with Chris (*id.* at 132). After church they went home and stayed home until she went to pick up Andrew, but Chris stayed home and did not accompany her when she went to pick up Andrew (*id.* at 133). Lastly, Ms.

Abernathy testified that when she picked up Andrew on Easter Sunday he made no report of any excitement or significant event occurring over the weekend (*id.*).

On cross-examination, Ms. Abernathy acknowledged that both Chris and Andrew had spent weekends at Ms. Bowen's home, prior to April 1999, where they both got to know C.A. and T.A. (*id.* at 134). She also noted that Chris and Petitioner hung around together and that Petitioner swam with Chris and the other kids (*id.* at 135). She again stated that Chris was not there during the Easter weekend, and she explained that her mother would only keep one of her sons at a time, so either Chris or Andrew could stay overnight at Ms. Bowen's but not both (*id.* at 136). Lastly, she stated that after she picked up Andrew on the evening of Easter Sunday they (including Chris) stopped going "out there" and did not return to Ms. Bowen's house for four or five months (*id.* at 136–37).

The defense next called Christopher Veach (*id.* at 138–47). He testified that he went to the beach on either the Saturday or Sunday of Easter weekend and got caught in an undertow (*id.* at 140). His mother tried to rescue him, and then her boyfriend had to rescue both him and his mother (*id.*). He stated that he and his mother were sick the night of the undertow incident (*id.* at 141). He further stated that one to two days after he "drowned in the undertow" he went to his grandmother's (Ms. Bowen's) house (*id.*). Mr. Veach then specifically testified that the incident at the beach was on Easter Sunday and that he had spent the previous day, Saturday, at his grandmother's house, but he did not spend the night with her on Saturday and was not there after the sun went down (*id.* at 142). He explained that he had gone to Ms. Bowen's on Saturday with his mother to drop off Andrew, but then Andrew decided he did not want to spend the night because he wanted to go to the beach on Sunday (*id.*). He also testified that although he had spent the night at his grandmother's house on previous occasions, he had never been on the dock with C.A. after 6:00 p.m. on those occasions, but he had gone swimming with C.A. and Rocky during the day (*id.* at 143–44). Mr. Veach stated that he had never been on the houseboat at all, including at any time during the "day or night" with C.A., and he had never taken a flashlight on the pier after dark (*id.* at 143, 145–46). Lastly, he stated he had never seen any sort of physical interaction, such as hugging, touching, kissing, or anything that could be construed as a sexual relationship, between C.A. and Petitioner (*id.* at 146–47).

On cross-examination, Mr. Veach clarified that his brother Andrew did not spend the night at his grandmother's house on the Saturday before Easter because he changed his mind and wanted go to the beach the following day, and that he (Chris Veach) did not spend the night there on Saturday either (*id.* at 148, 154). He also stated that both he and Andrew were at his grandmother's house for part of the day on Saturday, and that he saw T.A. and C.A. swimming, but neither he nor Rocky went swimming with them that day, although they had done so on other occasions (*id.* at 149). He said the girls went on the houseboat all the time, but he maintained that he had never been on the houseboat (*id.* at 150). Lastly, Mr. Veach stated he was not sick the day after the near drowning and did not go to church on Easter Sunday (*id.* at 152–53).

The next witness called by the defense was James Bell, Petitioner's brother, who first admitted he had previously been convicted of twenty-eight felonies and one misdemeanor crime involving theft or false statement (*id.* at 157). He stated that he used to live in Ms. Bowen's house but gave Petitioner his bedroom, and in April 1999 he was staying in a guest house behind Ms. Bowen's house, about twenty feet from the dock where he had a clear view of the houseboat (*id.* at 158). Mr. Bell testified that on the Saturday night of Easter weekend, he lit a fire close to the dock, and he never saw anyone on the dock or on the boat before he went to bed around 1:00 a.m. (*id.* at 159). He stated that there was no way someone could have snuck on the boat that evening without him seeing them (*id.* at 160). Mr. Bell testified that he knows C.A. and T.A., and that he saw them on Saturday evening, but they were playing in the back yard of their property, and Petitioner was not with them (*id.* at 160). However, he had seen Petitioner swimming with Chris and the girls earlier that day (*id.* at 163–65). Mr. Bell also testified that he had seen Petitioner on Saturday evening talking to his (Mr. Bell's) cousin (*id.* at 165). Lastly, Mr. Bell stated that he never went inside Ms. Bowen's house on Saturday evening (*id.* at 166).

The defense next called Philip Nix, a sexual crimes investigator with the Escambia County Sheriff's Office, who was assigned to investigate this case on May 24, 1999 (Ex. B at 167–68). Investigator Nix's testimony on direct and cross-examination revealed that upon being assigned this case he first interviewed Ms. Smith and learned of the entry in T.A.'s diary, but he did not seek a warrant for Petitioner's arrest based only on the information gathered from Ms. Smith (*id.* at 168–69, 172). Rather, he set up an appointment to interview T.A. (and presumably C.A.), but no one

appeared for the scheduled appointment (*id.* at 168, 172). Following the missed appointment Ms. Smith phoned Investigator Nix and explained that the reason they missed the appointment was because C.A. had been injured in a diving accident in June 1999 and was paralyzed from her chest down and on a respirator (*id.* at 172; *see also id.* at 108). After consulting with the State Attorney's Office and explaining his concern about interviewing C.A. or seeking a medical examination of C.A. under those circumstances, Investigator Nix sought an arrest warrant without interviewing C.A. or having her undergo a physical examination (*id.* at 170–71, 173). However, Investigator Nix explained, physical examinations conducted more than seventy-two hours after a sexual encounter are not generally helpful because crucial evidence, such as hair or semen samples, no longer exist (*id.* at 171). Moreover, although C.A. claimed she was a virgin at the time of the encounter with Petitioner, Investigator Nix testified that injury or evidence of recent sexual activity would not necessarily exist at or following the time he began investigating the case (*see id.*). Investigator Nix testified that he did not remember whether he had seen T.A.'s diary entry, but no such entry was taken into evidence (*id.* at 169).

On cross-examination Investigator Nix testified that although C.A. did not undergo a physical examination, he obtained a statement from T.A. before seeking a warrant for Petitioner's arrest (but he did not interview C.A. because of her condition), which he felt was sufficient evidence to support the issuance of an arrest warrant (*see id.* at 171–72).[8]

The next witness to testify was Charles Andrew Previs ("Andrew") (Ex. C at 186). Andrew testified that he spent the Friday of Easter weekend with his mother, Ms. Abernathy, and he was with her until he went to his grandmother's (Ms. Bowen) house at about 5:00 or 6:00 p.m. (*id.* at 187–88).

He testified that when he was at Ms. Bowen's house, he saw T.A. and C.A. on the back porch (presumably Mr. Parker's back porch), but neither he nor Petitioner visited with them that evening

---

[8] Defense counsel later recalled Investigator Nix to ask a few questions he had forgotten to ask. In relevant part, Investigator Nix testified that when he first interviewed T.A. she reported that Petitioner and C.A. had sex on a boat that was "in the yard," and he did not understand her statement to mean that the sex took place on a boat that was "moored on a pier on the water" (Ex. C at 210, 212). On cross-examination, Investigator Nix testified that by the time he went to the scene to investigate, the houseboat had been sold and was gone, and he never had an opportunity to see the location of the boat (*id.* at 213). He was never told, though, that the boat on which the sex took place was on a trailer (*id.*). Additional testimony elicited from Investigator Nix during his recall will be discussed more fully *infra*.

(*id*. at 189). He testified that he spent almost the entire night with Petitioner playing Nintendo and watching movies, and that they stayed up until about midnight and then went to bed (*id.*). He testified that his mother picked him up on Saturday morning around 10:00, and they went home; however, on Saturday at around 6:00 p.m. she took him back to his grandmother's house (*id.* at 190–91). Andrew testified that he did the same thing with Petitioner as they had done the night before, again from approximately 6:00 p.m. until midnight, and he did not see C.A. or T.A. Saturday evening (*id*. at 191–92). Andrew testified that his mother picked him up on Easter Sunday morning around 7:00 or 8:00 a.m., and he, his brother, his mother, and his mother's boyfriend went to the beach (*id.* at 192). He testified that his bother almost drowned, and his mother and her boyfriend started arguing, so he wanted to go back to his grandmother's house, and his mother took him to Ms. Bowen's house at about 1:00 p.m. (*id.* at 192–93). He testified that he saw C.A. and T.A. on Sunday, grilling on the back porch, but Petitioner had no contact or interaction with them (*id.* at 193–94). He further testified that he spent Sunday night at his grandmother's house and again played games with Petitioner that evening, and he did not see C.A. or T.A. on Sunday evening (*id.* at 194). Andrew also testified that he had previously seen C.A. and T.A. on the pier and previously swam with C.A. and T.A.; he also testified that he had fished off the pier at night and been on the houseboat, but he had never been on the pier at night with C.A. and T.A. and had never been on the boat at night (*id.* at 195–96). Lastly, Andrew testified that he had never observed any type of improper physical contact between Petitioner and C.A. (*see id.* at 196–97).

On cross-examination, Andrew testified that Chris did not spend much time at his grandmother's house during Easter weekend, although he (Chris) spent some time there because he came with his mother to drop him (Andrew) off on Saturday and pick him up on Sunday (*id.* at 198–99). He estimated that it took approximately forty-five minutes to drive from his mother's home to his grandmother's home (*id.* at 199–200). He also testified that when Chris almost drowned at the beach, he (Andrew) was the one who pulled him to safety (*id.* at 202). He stated that he had previously seen Petitioner swim with C.A. and T.A., but not during the Easter weekend (*id.* at 203–04).

The next witness to testify was Jeanie Bowen (*id.* at 217). She stated that Petitioner was living with her during the Easter weekend of 1999, and she remembered the weekend (*id.* at

218–19).  Ms. Bowen testified that Petitioner worked on Friday, and when he got home he played Nintendo and Sega, and Andrew was with him on Saturday, Sunday and, she thought, on Friday (*id.* at 220).  She testified that she had seen C.A. and T.A. Friday evening, but Petitioner was not with them (*id.* at 221).  Ms. Bowen also saw C.A. and T.A. on Saturday, but Petitioner was not with them, and he did not go out on the pier with them that evening (*id.* at 121–23).  She did not see C.A. and T.A. on Sunday evening (*id.* at 123).

On cross-examination Ms. Bowen testified that Andrew spent the night on Friday night, was at her house the whole day on Saturday, spent the night at her house on Saturday night, and on Sunday morning his mother picked him up to take him to the beach (*id.* at 227–28).  She testified that Andrew returned on Sunday evening and spent Sunday night with her (*id.* at 228).  She stated that the only time Christopher was at her house over the weekend was when he was with his mother and she was dropping off Andrew (*id.* at 229).

Petitioner was the last witness to testify (*id.* at 235).  Petitioner first acknowledged that he had previously been convicted of eight felonies (*id.* at 236).  Petitioner then denied ever having any sexual relations or inappropriate physical contact with C.A. or ever going onto the houseboat with T.A., C.A., or Chris (*see id.* at 237, 239).  Additionally, he denied ever having "any sort of physical contact" with C.A. or T.A. "other than an incidental touching" (*id.* at 237).  Petitioner stated that he did not go on the pier after sundown on either Saturday or Sunday of the Easter weekend (*id.* at 242).  He stated he has previously been on the pier after dark but never with C.A. or T.A. (*id.*).  Petitioner admitted previously swimming with C.A. and T.A. but stated that he never "touched" C.A. (*id.* at 240).  Petitioner testified that had been on the houseboat before, and he described the length and design of the boat (*id.* at 237–38).  Petitioner also stated that he had been inside the houseboat before because it was for sale, and he and his mother were thinking about buying it from Mr. Parker (*id.* at 238).  Petitioner stated that Mr. Parker was asking $4,000.00 for the boat, but only one of the boat's motors ran, and the boat had other problems, including leaks, and it was "constantly sinking" (*id.*).  Petitioner explained that he did not buy the boat "because it was too bad out of --- it was rough" (*id.* at 238–39).  Lastly, Petitioner testified that he recalled having a conversation with Ms. Smith about C.A.'s crush on Petitioner, but Petitioner testified that Ms. Smith told him that she told

C.A. "don't even think about it" after Ms. Smith saw C.A. watching Petitioner one day when Petitioner was washing his truck (*id.* at 241).

The State did not present any rebuttal testimony, and the trial proceeded to closing arguments. Relevant to the instant habeas petition, at defense counsel's request the jury was instructed that battery was a lesser included offense of Count One and that if the elements of lewd assault had not been proven, the jury should then consider whether Petitioner was guilty of battery (*see* Ex. C. at 252, 298). In closing arguments Petitioner's counsel did not argue that Petitioner should be convicted of battery; rather, he asserted that Petitioner was guilty of no crime because C.A. and T.A.'s accusations were untrue (*see id.* at 270–86).

## V. PETITIONER'S CLAIMS

### A. Ground One: "Counsel was ineffective when counsel failed to file pre-trial motion to suppress any testimony relating to an address book/diary and boat by state witness."

Petitioner contends he received ineffective assistance of counsel because defense counsel failed to move to suppress testimony regarding the "alleged diary entry" and houseboat (Doc. 1 at 4B). Petitioner appears to suggest that because the diary entry, which was missing at the time of Petitioner's trial, and the houseboat, which had been sold before Petitioner's trial and had not been inspected by his counsel or law enforcement prior to its sale, were not available to submit into evidence, any trial testimony regarding the diary entry and boat was hearsay and counsel should have moved to suppress the testimony (*id.* at 4B–4C).

Respondent concedes that Petitioner exhausted this claim by presenting in his Rule 3.850 motion and appealing the denial of the motion to the First DCA (*see* Doc. 10 at 2, 9). Respondent additionally states that the state court evaluated the claim under the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984) and determined that the deficient performance prong of the Strickland standard was not met (*id.* at 7). Respondent asserts the state court's adjudication of the claim was not contrary to or an unreasonable application of Strickland (*id.* at 9–11).

### 1. Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have

been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As to the prejudice prong of the Strickland, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Strickland, 466 U.S. at 693. However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

        2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground One in his Rule 3.850 motion (Ex. T at 2–4).  In the state court's written opinion denying Petitioner's Rule 3.850 motion, the state court identified Strickland as setting forth the controlling legal standard for analyzing claims of ineffective assistance of counsel (*id.* at 34–36).  Then, in denying relief on this claim, the state court noted that defense counsel cannot be ineffective for failing to file a motion to suppress where existing case law does not require suppression (*id.* at 36).  The court explained that Petitioner appears to have misunderstood the value of eyewitness testimony, noting it is not the diary that witnessed the offenses in question but rather the author of the diary (*id.* at 36–37).  Therefore, the court stated, it "is of no consequence that the page of the diary and the boat were unavailable as evidence" because T.A. was available to provide a first-hand account of what she witnessed (*id.* at 37).  Moreover, the judge concluded, "because testimony regarding the information allegedly contained on the missing page of the diary and the boat were admissible at trial, a motion to suppress would have been denied" because no viable legal ground for suppression existed (*id.*).

Because the state court correctly identified Strickland as the governing precedent, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable determination of the facts or that the state court decision was an unreasonable application of Strickland.

Petitioner has offered no authority for his proposition that grounds existed for suppressing the testimony at issue, and the court is aware of none.  With regard to the diary entry, as noted *supra*, Ms. Smith testified first and was the first witness to mention the diary entry.  Although she testified

as to the contents of the diary entry, her testimony was not hearsay because it was not offered to prove the truth of the matter asserted. Rather, Ms. Smith's testimony was offered to explain why she questioned C.A. and T.A. about whether C.A. had a sexual encounter with Petitioner or why she called the police to investigate the matter following her discovery of the diary entry, or both (*see* Fla. Stat. § 90.801 (defining hearsay as "a statement, other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); Fed. R. Evid. 801(a)(c) (same)). Moreover, as the trial court noted, T.A. testified at Petitioner's trial that she personally observed Petitioner and C.A. having sex, and afterward she made the diary entry regarding her observations. The fact that the diary entry was missing at the time of Petitioner's trial provides no basis for suppressing T.A.'s testimony regarding her observations, as memorialized in the diary entry, despite Petitioner's assertion that the diary might have said that "Mickey" was the perpetrator and not Petitioner (*see* Doc. 1 at 4D, 5A). Likewise, the fact that the houseboat was not available at the time of Petitioner's trial provides no basis for suppressing testimony regarding events that took place on the boat, even though—as Petitioner suggests—the boat may have contained DNA evidence, or photographs of the boat might have been helpful to demonstrate where T.A. was positioned when she observed the encounter between Petitioner and C.A. (*see id.* at 5A).[9] Lastly, the state court specifically found that had a motion to suppress been filed, it would have been denied because the testimony was admissible under Florida law. Trial counsel, therefore, did not perform deficiently by failing to move to suppress testimony regarding the diary entry and boat, as no valid basis for filing such a motion existed.

Accordingly, the state court decision denying Petitioner's claim was not an unreasonable application of Strickland.[10]

B.  Ground Two: "Counsel was ineffective when counsel failed to file a pre-trial motion to dismiss Count Two of the Amended Information as to state's misconduct."

---

[9] Petitioner's suggestions regarding the boat, like his assertion regarding the diary entry (that is, that it might have said "Mickey") are contained within his second ground for relief, but they appear to pertain to his first ground for relief. Therefore, they are considered here.

[10] The trial court did not address, and did not need to address, the prejudice prong of Strickland. *See* Turner, 339 F.3d at 1279.

Case No. 3:06cv482/MCR/EMT

Petitioner contends that defense counsel should have moved to dismiss Count Two of the amended information, charging Lewd and Lascivious Sexual Battery Upon a Child Under the Age of Sixteen, because C.A. was never physically examined by a physician, or similarly, because the State failed to require that C.A. undergo a physical examination, and the State's failure to do so was "misconduct" (*see* Doc. 1 at 4C). Petitioner contends that a physical examination would have revealed whether C.A. "was sexually active" (*id.* at 4D). Respondent concedes that Petitioner exhausted this claim in the state courts by presenting it as Issue Two in the Rule 3.850 motion and appealing the denial therefrom (*see* Doc. 10 at 2, 5, 12).

1.            Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel was set forth *supra*.

2.            Federal Review of State Court Decision

As previously noted, the state court identified <u>Strickland</u> as setting forth the controlling legal standard for analyzing ineffective assistance of counsel claims (Ex. T at 34–36). In the written order denying Petitioner's claim the state court found that the State's failure to have C.A. physically examined was not "misconduct," defense counsel had no meritorious basis for filing a motion to dismiss Count Two, and had such a motion been filed it would have been denied (*id.* at 38). Therefore, the state court concluded, "counsel cannot be deemed ineffective for failing to file a meritless motion" (*id.*).

Pursuant to Rule 3.190(c)(4) of the Florida Rules of Criminal Procedure, a defendant may move for dismissal of a charge alleging in the motion that "[t]here are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant." Fla. R. Crim. P. 3.190(c)(4). Under this rule, a defendant has the burden to specifically allege and swear to the undisputed facts in a motion to dismiss and to demonstrate that no prima facie case exists upon the facts set forth in detail in the motion. <u>State v. Kalogeropolous</u>, 758 So. 2d 110, 111 (Fla. 2000). The State need only specifically dispute a material fact alleged by the defendant or add additional material facts that meet the minimal requirement of a prima facie case. *Id.* at 112. If a material fact is disputed, denial of the motion to dismiss is mandatory. *Id.* (citing <u>Boler v. State</u>, 678 So.2d 319, 323 (Fla. 1996)). The State is not obliged to produce evidence sufficient to sustain a conviction; as

long as the State shows the barest prima facie case, it should not be prevented from prosecuting. State v. Bonebright, 742 So. 2d 290, 291 (Fla. 1st DCA 1998) (citation omitted). Lastly, in considering a motion to dismiss the information in a criminal case, the trial court must construe all evidence and inferences in a light most favorable to the State. *Id.* (citation omitted).

In the instant case, Petitioner first contends his counsel should have filed a pre-trial motion to dismiss based only on the ground C.A. that was never physically examined (*see* Doc. 1 at 4C–4D, 5A). Although the fact that C.A. was never examined is undisputed, the fact is immaterial. The material facts—such as those concerning whether a sexual battery occurred—were in dispute, and because they were in dispute, the trial court would have been required to deny a motion to dismiss Count Two. Kalogeropolous, 758 So. 2d at112. Furthermore, in light of the fact that the evidence adduced by the State was sufficient to survive a motion for judgment of acquittal (*see* Ex. B at 124; Ex. C at 255), Petitioner has failed to show a reasonable probability that the trial court would have granted a pre-trial motion to dismiss based on the lack of a physical examination.

Additionally, with regard to Petitioner's second contention—that a motion to dismiss should have been filed based on misconduct by the State—the state court found that no misconduct occurred, so no meritorious basis existed for filing a motion to dismiss. Petitioner has not shown (and cannot show) that it was unreasonable for the state court to determine that no misconduct occurred when the State failed to compel C.A., a paralyzed thirteen-year-old victim of an alleged sexual battery, to undergo an intrusive physical examination long after the significant seventy-two-hour window following the sexual battery, as described by Investigator Nix, had passed.[11] Counsel's failure to move to dismiss Count Two based on misconduct by the State, therefore, cannot be deemed deficient performance. Accordingly, the state court decision denying Petitioner's claim was not an unreasonable application of Strickland.[12]

---

[11] As previously noted, Ms. Smith did not contact law enforcement until the middle of May 1999, which was approximately a month and a half after C.A.'s sexual encounter with Petitioner.

[12] In Petitioner's reply to Respondent's answer, he appears to recharacterize his claim as ineffective assistance of counsel based upon counsel's failure to seek a pre-trial order compelling C.A. to undergo a physical examination (*see* Doc. 16 at 3–8 ). This additional claim for relief as to Ground Two, asserted for the first time in Petitioner's reply, is the same claim raised by Petitioner in Ground Five of the instant petition and will therefore be discussed *infra*.

C.     Ground Three: "Counsel failed to argue in closing argument that Petitioner was only guilty of battery the lesser offense in Count One."

Petitioner generally asserts that there was no evidence to support the charge in Count One, Lewd and Lascivious Assault Upon a Child Under the Age of Sixteen, and the "most Petitioner could be guilty of [is] battery," a lesser included offense (Doc. 1 at 5B).  Therefore, Petitioner contends, his trial counsel was ineffective for failing to argue that Petitioner was "only guilty of battery" (*id.* at 5A).  Respondent concedes that the claim, presented as Issue Three in Petitioner's Rule 3.850 motion, was exhausted in the state courts (Doc. 10 at 2, 13).

1.     Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel was set forth *supra*.

2.     Federal Review of State Court Decision

As previously noted, the state court identified <u>Strickland</u> as setting forth the controlling legal standard for analyzing ineffective assistance of counsel claims (Ex. T at 34–36).  In the written order denying Petitioner's claim the state court found that Petitioner's assertion that no evidence supported the charge in Count One was refuted by the record, noting in relevant part the testimony of C.A. (*id.* at 39 n.8).  The court further found that counsel made a strategic choice throughout the trial to argue that Petitioner committed no offense; therefore, it would have been disingenuous to argue during closing arguments that Petitioner committed the crime of battery (*see id.* at 39).  Additionally, the court concluded, counsel's strategic choice did not constitute deficient performance (*id.*).

Initially, Petitioner has failed to present clear and convincing evidence to rebut the state court's factual findings regarding the evidence presented by the State in support of Count One; therefore, those findings are presumed correct.  Moreover, the trial transcript supports the trial court's findings.  In relevant part, C.A. testified in response to a question regarding whether she and Petitioner had "any physical contact," that Petitioner had grabbed her "butt and [] breasts" (Ex. B at 101).[13]  Thus, the trial court's finding was based upon a reasonable determination of the facts in

_____

[13] The amended information specifically charged Petitioner in Count One with unlawfully handling, fondling, or making an assault on C.A., between January 1, 1999 and April 4, 1999, by "**GRABBING AND TOUCHING [C.A.'s] BREASTS**" (Ex. A at 2) (capitalization and bold in original).

light of the evidence presented at Petitioner's trial. Petitioner has therefore failed to demonstrate that counsel's failure to argue for a lesser conviction on Count One, based on the State's failure to present any evidence in support of the offense as charged in Count One, constituted deficient performance.

Likewise, the record supports the trial court's related finding that Petitioner's counsel made a strategic decision to forego arguing that Petitioner was guilty of <u>any</u> crime, and that his strategic decision did not constitute deficient performance. As previously noted, Petitioner's counsel specifically asked the judge to instruct the jury on the lesser included offense of battery, the judge agreed to do so, and the jury was so instructed. Petitioner's counsel, therefore, was obviously aware that he could argue for a lesser conviction on Count One, but instead of arguing that Petitioner was guilty of any crime, including battery, counsel argued that no crime occurred, which was consistent with the theory of the defense (that is, that C.A. and T.A.'s testimony was not truthful and that Petitioner never touched C.A. in an inappropriate manner). For example, consistent with the defense theory, Petitioner's counsel presented several witnesses who testified that Chris was not present during the relevant time frame, which directly impeached the testimony of both T.A. and C.A. Moreover, Petitioner testified in his own defense and specifically asserted that he never touched C.A. in an inappropriate manner and had no physical contact with her "other than an incidental touching." Thus, it would have been disingenuous, as well as contrary to the theory of the defense and Petitioner's testimony, for Petitioner's counsel to argue that Petitioner was guilty of battery.[14] Moreover, because the jury was instructed on the lesser offense, the jury had the option of convicting Petitioner of battery if warranted by the evidence,[15] but Petitioner's trial counsel did not lose credibility with the jury, contradict Petitioner's testimony, or contradict the theory of the defense by arguing that Petitioner was guilty of any crime. Thus, the trial court's finding—that counsel did not perform deficiently by failing to argue that Petitioner was guilty of a lesser

---

[14] The jury was specifically instructed that to find Petitioner guilty of battery, "the State must prove the following element beyond a reasonable doubt: That is, [Petitioner] <u>intentionally</u> touched or struck C.A. against her will." (Ex. C at 298) (emphasis added).

[15] It is well established in the Eleventh Circuit that jurors are presumed to follow the court's instructions. *See* <u>Brown v. Jones</u>, 255 F.3d 1273, 1280 (11th Cir. 2001) (citing <u>Ingram v. Zant</u>, 26 F.3d 1047, 1053 (11th Cir. 1994)); <u>Raulerson v. Wainwright</u>, 753 F.2d 869, 876 (11th Cir. 1985) ("Jurors are presumed to follow the law as they are instructed.")).

offense—was not objectively unreasonable. Petitioner has therefore failed to demonstrate that the state court unreasonably applied <u>Strickland</u> in denying his claim, and he is not entitled to habeas relief on this claim.

    D.    <u>Ground Four: "Counsel was ineffective in failing to depose state witnesses and the alleged victim prior to trial."</u>

Petitioner asserts that the record reflects that C.A. and T.A.'s depositions were scheduled, but that "does not mean that they were taken and there's no record proving they were taken" (Doc. 1 at 5B). Petitioner thus contends that counsel was ineffective by failing to prepare a defense and "ascertain the truth concerning the charge" (*id.*). Respondent concedes that the claim was exhausted below, noting that it was presented as Issue Five in Petitioner's Rule 3.850 motion (Doc. 10 at 2, 15).

    1.    Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel was set forth *supra*.

    2.    Federal Review of State Court Decision

As previously noted, the state court identified <u>Strickland</u> as setting forth the controlling legal standard for analyzing ineffective assistance of counsel claims (Ex. T at 34–36). In the written order denying Petitioner's claim the state court found that Petitioner failed to establish that depositions of C.A. and T.A. were not taken, and the fact that their depositions were scheduled suggests that the depositions were likely taken (*id.* at 40–41; *see also* Ex. T, Attach. (deposition notices for both C.A. and T.A.)). However, the trial court assumed "for the sake of argument" that the depositions were not taken and concluded that Petitioner failed to demonstrate he was prejudiced by counsel's failure to depose C.A. and T.A. prior to trial (*id.* at 41).

To the extent the trial court's finding that depositions were "likely" taken can be construed as a factual finding, Petitioner has failed to present clear and convincing evidence to rebut the finding. Indeed, in the instant petition Petitioner does not assert that the depositions were <u>not</u> taken; he merely asserts that the depositions were scheduled, but "there's no record proving they were taken" (Doc. 1 at 5B). Thus, Petitioner has not established that his counsel performed deficiently by failing to take to their depositions.

Moreover, even if Petitioner had established deficient performance by his counsel, the undersigned agrees with the state court that Petitioner failed to demonstrate he was prejudiced by the failure to depose C.A. and T.A., and he has likewise failed to do so in the instant petition. In the Rule 3.850 motion Petitioner noted several inconsistencies between the trial testimony of C.A. and T.A., such as whether C.A. was wearing pants or a dress the night she and Petitioner had sex, and whether Chris looked inside the boat during the sexual encounter (*see* Ex. T at 11), which the trial court found insufficient to establish prejudice.[16] In the instant petition, however, Petitioner makes no specific assertion as to how he was prejudiced by counsel's failure to depose C.A. and T.A.; he only generally asserts that his counsel had a duty prepare a defense and investigate, including an obligation to interview as many witnesses as possible, but counsel's performance "fell below the range of competent counsel and prejudiced Petitioner in the right to a fair trial" (Doc. 1 at 5D).[17] Moreover, Petitioner has not alleged, nor do the facts suggest, that the outcome of his trial would have been different had C.A. and T.A. been deposed. Indeed, the record suggests otherwise. The inconsistencies between C.A. and T.A.'s trial testimony bolstered the defense theory that they were not testifying truthfully, especially considering that the jury was later instructed that in deciding whether to believe or disbelieve the testimony of a witness, the jury should consider whether a witness' testimony agreed with other testimony in the case (Ex. C at 300–01). Furthermore, had C.A. and T.A. been deposed prior to trial and learned (from review of the deposition transcripts or from the prosecutor or otherwise) that their testimony differed, any inconsistencies could have been mitigated or explained during trial. Here, however, the inconsistencies came to light during Petitioner's trial, which effectively eliminated any opportunity for the prosecutor to mitigate the impact of the conflicting testimony. Therefore, the state court decision denying Petitioner's claim,

---

[16] In denying Petitioner's Rule 3.850 motion, the trial court found that the inconsistencies identified by Petitioner were before the jury and weighed by the jury in considering the testimony of C.A. and T.A. (Ex. T at 41).

[17] In Grounds Six and Seven of the instant petition Petitioner alleges that counsel should have deposed Mickey Parker and investigated a potential witness named George Mall, and those claims are addressed *infra*. Thus, despite Petitioner's broad language concerning counsel's duty to "interview and examine as many possible persons," the instant ground for relief appears to concern only his counsel's pre-trial preparation with regard to C.A. and T.A. (Doc. 1 at 5D).

based upon a finding that Petitioner was not prejudiced by his counsel's performance, was not an unreasonable application of <u>Strickland</u>, and Petitioner is not entitled to relief on this claim.

     E.    <u>Ground Five: "Counsel failed to petition the court to have the victim [C.A.] tested for sexual activity."</u>

Petitioner contends counsel should have moved the court to compel a physical examination of C.A. because the State's theory was that vaginal penetration had occurred, an examination "would have proven Petitioner did not commit the act," and the lack of an examination resulted in an unfair trial (Doc. 1 at 5D–5E).  Respondent concedes that the claim was exhausted below, noting that it was presented as Issue Six in Petitioner's Rule 3.850 motion (Doc. 10 at 2, 17).

     1.    Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel was set forth *supra*.

     2.    Federal Review of State Court Decision

As previously noted, the state court identified <u>Strickland</u> as setting forth the controlling legal standard for analyzing ineffective assistance of counsel claims (Ex. T at 34–36).  In the written order denying Petitioner's claim the state court found that there was no evidence to indicate that Defendant's assertion was true[18] and that an examination could have "just as easily" revealed the opposite (that is, that C.A. did not appear to be a virgin) (Ex. T at 42).  The court further stated that the failure to seek a medical examination appeared to be a strategic decision because counsel argued in closing arguments that no trial evidence established that C.A. had been physically examined (*id.*).

Initially, the state court's conclusion (that is, that counsel was not ineffective for failing to seek a physical examination of C.A. because no evidence supported Petitioner's assertion that an examination would have revealed that C.A. was a virgin) was not unreasonable under <u>Strickland</u>. The state court determined that although a physical examination might have revealed that C.A. appeared to be a virgin, the examination could have "just as easily revealed" that C.A. was not a

---

[18] In the Rule 3.850 motion, unlike in the instant petition, Petitioner specifically asserted that a physical examination would have revealed that C.A. "was in fact still a virgin and that she was not sexually active" (*see* Ex. T at 13).  Petitioner further alleged that as a result of this discovery, the State would have dismissed the charges or the outcome of his trial would have been different (*id.*).

virgin. Thus, counsel was not ineffective for failing to seek a physical examination based only on Petitioner's speculation, especially considering that the examination results might have been harmful to Petitioner's case. Likewise, Petitioner's assertion in the instant petition, that a physical examination "would have proven Petitioner did not commit the act," is devoid of any factual support and purely speculative. Absent any evidence that an examination would have exonerated Petitioner, as he suggests, this court cannot conclude that his counsel was ineffective for failing to seek a physical examination of C.A.

Moreover, Petitioner has not established that he was prejudiced by counsel's failure to seek a physical examination. First, even if the results of a physical examination revealed that C.A. appeared to be a virgin, the results would not have proven that "Petitioner did not commit the act," as Petitioner asserts. Count Two charges that Petitioner engaged "in oral, anal or vaginal penetration by <u>or union with</u> [Petitioner's] sexual organ upon . . . [C.A.] . . ., to wit: [Petitioner] engaged in anal or vaginal penetration with [C.A.] . . . " (Ex. A at 2) (emphasis added). And with regard to Count Two, the jury was instructed that to find Defendant guilty the jury must find that Petitioner "committed an act upon or with [C.A.] in which the sexual organ of [Petitioner] penetrated <u>or had union with</u> the vagina of [C.A.]" (Ex. C at 296–97) (emphasis added). Thus, to be guilty, Petitioner's sexual organ need only have made "union with" C.A.'s vagina, and a physical examination would not have revealed whether the minimal amount of "union," sufficient to convict, was made. *See, e.g.*, <u>Dorch v. State</u>, 458 So. 2d 357, 358 (Fla. 1st DCA 1984) ("contact alone, between the sexual organ of the offender and the mouth, anus, or vagina of the victim, is sufficient to convict"). Moreover, to the extent Petitioner contends the State's theory was that "penetration" occurred, and therefore "penetration"—as opposed to "union with"—must have been proven (a contention that is contradicted by the trial court's instructions to the jury and was not specifically raised below), the undersigned's conclusion remains the same; that is, that a physical examination would not necessarily have revealed whether the minimal amount of "penetration," sufficient to convict, was made. *See, e.g.*, <u>Seagrave v. State</u>, 802 So. 2d 281, 287 n.7 (Fla. 2001) (". . . penetration requires some entry into the relevant [body] part, however slight'") (quoting <u>Richards v. State</u>, 738 So. 2d 415, 418 (Fla. 2d DCA 1999)); <u>Pride v. State</u>, 511 So. 2d 1068, 1070 (Fla. 1st

DCA 1987) ("any penetration, no matter how slight, constitutes a completed sexual battery").[19]

Second, even if Petitioner did not engage in sexual intercourse with C.A. as he asserts, and C.A. was a virgin on April 4, 1999 as she testified, Petitioner has not asserted any knowledge regarding whether C.A. engaged in intercourse after April 4, 1999. Absent this knowledge, examination results indicating that C.A. was not a virgin would be inconclusive as to whether C.A.'s first sexual intercourse occurred on April 4, 1999, and the results would have bolstered the State's case. Third, Petitioner has not established that the trial court would have granted a motion to compel a physical examination. As noted by the court in State v. Kuntsman:

> [Florida] Rule [of Criminal Procedure] 3.220 does not provide a trial judge with the authority to compel a witness to perform any type of involuntary physical examination. State v. Smith, 260 So. 2d 489, 490 (Fla. 1972) (quashing a trial court order compelling prosecution witnesses to submit to an optical examination to test their visual acuity). In Smith, the Supreme Court noted that only in "rare instance[s]" would a trial court have the authority to order an involuntary examination of a witness. Smith, 260 So. 2d at 490 (finding the defendant's claim that the State's case primarily depended upon the identification of the defendants by eyewitnesses insufficient to warrant an involuntary eye examination). Subsequent to the Supreme Court's decision in Smith, the District Courts have recognized a trial court's authority to order an involuntary examination of a prosecution witness, but have limited the exercise of that authority to situations where strong and compelling reasons exist. See State v. Camejo, 641 So. 2d 109 (Fla. 5th DCA 1994) (quashing the trial court's order compelling the victim of a sexual battery to undergo psychological evaluation by a psychiatrist), question certified on reh'g, 641 So. 2d 109 (Fla. 5th DCA 1994); Bartlett v. Hamwi, 626 So. 2d 1040 (Fla. 4th DCA 1993) (denying defendant's request for hair samples from a prosecution witness); State v. LeBlanc, 558 So. 2d 507 (Fla. 3d DCA 1990) (holding that a trial court must not subject a victim to an involuntary psychological examination absent strong and compelling evidence of a victim's veracity, or mental or emotional instability); State v. Diamond, 553 So. 2d 1185 (Fla. 1st DCA 1988) (quashing a trial court's order requiring a child witness to submit to a gynecological examination by the defendant's expert gynecologist); State v. Coe, 521 So. 2d 373 (Fla. 2d DCA 1988) (holding that the trial court could not compel a victim to undergo a psychiatric examination based merely on the allegations that the victim could not appreciate the duty to tell the truth, might have suffered from psychological problems, or might have suffered from alcoholism).

---

[19] The court notes that this is consistent with the testimony of Investigator Nix, that a physical examination of C.A. would not necessarily have revealed evidence of recent sexual activity (Ex. C at 171).

State v. Kuntsman, 643 So. 2d 1172, 1173 (3rd DCA 1994). In Petitioner's case, no strong and compelling reasons existed to support an order of the trial court requiring C.A. to undergo a physical examination. As noted *supra*, a significant amount of time elapsed between April 4, 1999 and Petitioner's arrest, C.A. was paralyzed by the time defense counsel was representing Petitioner, and the State had ample evidence to prove the sexual battery charge, including the testimony of two eyewitnesses and the testimony of Ms. Culver regarding Petitioner's admission. Thus, the case does not appear to be one of the "rare instances" where an involuntary examination could have been ordered by the trial court. *See* Fuller v. State, 699 So. 273, 274 (2nd DCA 1996) (trial court has the authority to order an involuntary examination of a prosecution witness only where strong and compelling reasons exist) (citing Kuntsman, 643 So. 2d at 1172).

For the foregoing reasons Petitioner has failed to meet his burden of establishing a reasonable probability that the trial court would have issued an order, at the request of Petitioner's counsel, compelling C.A. to undergo a physical examination, and that if such an order had issued, Petitioner would have been acquitted based on the examination results.[20]

Accordingly, the state court decision denying Petitioner's claim was not an unreasonable application of Strickland.[21]

F.     Ground Six: "Counsel failed to subpoena Mickey Parker for deposition."

Petitioner contends he gave counsel "information pertaining to the boat where the alleged crime took place, and counsel failed to call Mickey Parker who would have given defense counsel

---

[20] In Petitioner's reply, he states he has "consolidated" Grounds Two and Four (both of which relate to the lack of a physical examination of C.A.), and he asserts an additional argument in support of his claim for relief; namely, that even if the State did not commit misconduct in failing to have C.A. examined, and C.A could not have been compelled to undergo an examination, "any reasonable counsel could anticipate . . . that a gynecological examination would ensue," as C.A.'s family would have taken her for an examination, and counsel could have collected "exculpatory evidence" (presumably by obtaining the results of the family-initiated examination) (*see* Doc. 16 at 5–6). Not only was this claim not presented to the state courts, it is without merit. Petitioner's assertion in his reply that C.A. would necessarily have been examined—like the arguments raised in support of Ground Five in the petition—is devoid of any factual support and is purely speculative. Absent any evidence that a family-initiated examination occurred, and further, that the results exonerated Petitioner, this court cannot find conclude that his counsel was ineffective for failing to seek to obtain results of the purported physical examination of C.A.

[21] Although the trial court additionally determined, without conducting an evidentiary hearing, that Petitioner's counsel apparently made a strategic decision to forgo seeking a physical examination of C.A., the court need not decide whether the finding is erroneous because the trial court's other findings on Petitioner's claim are sufficient for this court to conclude that the trial court's reasoning and findings were not contrary to or an unreasonable application of Strickland.

Case No. 3:06cv482/MCR/EMT

a defense theory" (Doc. 1 at 5E). Respondent concedes that the claim was exhausted below, noting that it was presented as Issue Eight in Petitioner's Rule 3.850 motion (Doc. 10 at 2, 17).[22]

### 1. Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel was set forth *supra*.

### 2. Federal Review of State Court Decision

The state court identified <u>Strickland</u> as setting forth the controlling legal standard for analyzing ineffective assistance of counsel claims (Ex. T at 34–36). In the written order denying Petitioner's claim the state court found that counsel did not perform deficiently by failing to depose Mr. Parker because Mr. Parker was not listed on the State's witness list (*id.* at 44–45). Moreover, to the extent Petitioner alleged that Mr. Parker sold the boat in furtherance of a conspiracy or cover-up, the court noted Petitioner's trial testimony that the boat was for sale prior to the date the alleged offense occured, so it was not unusual "that a boat that was for sale ***before*** the incident in question sold after the incident" (*id.* at 44) (emphasis in original). The trial court next found that Petitioner's assertions regarding what photographs of the boat might have depicted were "pure conjecture" and did not establish that the testimony of C.A. or T.A. would have been impeached (*id.*). Lastly, the trial court stated that the record reflected a strategic decision to forgo investigation of the boat, as counsel argued in closing that the State's failure to locate the boat and take pictures of the boat created a reasonable doubt as to Petitioner's guilt (*id.*).

Initially, the claim raised here alleges only that Petitioner gave counsel information pertaining to the boat, and had Mr. Parker been located and subpoenaed for deposition, he would have provided a defense theory (*see* Doc. 1 at 5E). Thus, it is unclear whether Petitioner has

---

[22] Although the claim here and the claim in the Rule 3.850 motion are generally the same, Petitioner's arguments in the Rule 3.850 motion were much more extensive (*see* Ex. T at 15–17). In relevant part, Petitioner asserted in the Rule 3.850 motion that counsel knew Mr. Parker sold the houseboat prior to the criminal investigation, and law enforcement officers were unable to collect any evidence from the boat or take pictures of the boat (*id.* at 16). Petitioner contended that a deposition of Mr. Parker would have revealed why he sold the boat and what he knew about the crime (*id.*). Petitioner also appeared to contend that had Mr. Parker been deposed, he could have revealed the current location of the boat, and counsel could have then taken photographs of the boat, which would have revealed that T.A. could not see what she testified she saw and that C.A. could not have seen anyone during the encounter as she testified (*id.*).

asserted the same arguments here as those he asserted in support of Issue Eight in the Rule 3.850 motion, but the court will analyze the instant claim as if he has.

To the extent Petitioner contends his counsel should have located and interviewed Mr. Parker because he could have provided information regarding the boat's location, the boat could have been photographed, and photographs of the boat would have impeached the testimony of C.A. and T.A, the undersigned agrees with the state court that Petitioner's contentions are "pure conjecture." First, Petitioner has not established that the boat could have actually been located if Mr. Parker had been interviewed. For example, there is no evidence establishing that Mr. Parker knew (or retained) sufficient identifying information to locate the purchaser of the boat, or that the purchaser of the boat still maintained possession of the boat. Second, Petitioner has not explained how photographs of the boat would have impeached the testimony of C.A. and T.A. (although Petitioner alleged in the Rule 3.850 motion, for example, that photographs would establish that T.A. could not have seen the sexual encounter, he did not explain how the photographs would establish her inability to see; nor did Petitioner explain whether the photographs would demonstrate her inability to see from the hatch on the top of the boat, or from the door at the back of the boat, or both). Third, Petitioner has not explained why Andrew Previs, who had been on the houseboat and was therefore familiar with its layout, could not have described the boat and testified regarding T.A. and C.A.'s inability to see, or similarly, why he (Petitioner) could not have so testified (given that he chose to testify in his own defense); indeed, during his testimony Petitioner was specifically asked by his counsel to describe the boat, which provided Petitioner with the opportunity to explain its layout (*see* Ex. C at 237–38).

Additionally, to the extent Petitioner contends here, as he did in the Rule 3.850 motion, that Mr. Parker should have been subpoenaed for deposition, the state court found that Mr. Parker was not listed as a State's witness, so no reason existed for counsel to subpoena him for deposition. Petitioner has failed to rebut this factual finding with any evidence, much less clear and convincing evidence; therefore, it is presumed correct. Moreover, Rule 3.220 of the Florida Rules of Criminal Procedure, in effect at the time of Petitioner's trial, required prosecutors to disclose witnesses and designate those witnesses in categories A, B, or C. *See* Fla. R. Crim. P. 3.220 (1998). Category A witnesses could be deposed without leave of court; Category B witnesses could be deposed only upon leave of court; and Category C witnesses were not subject to deposition. Thus, because Mr.

Parker was not listed as a State's witness (or designated in a category that subjected him to deposition), defense counsel did not perform deficiently by failing to subpoena him for deposition.

Finally, Petitioner contends that Mr. Parker could have "given defense counsel a defense theory," but Petitioner has not explained the nature of defense theory, including whether it was the same theory pursued by Petitioner at trial or how Mr. Parker—who according to Petitioner's own witnesses was not an eyewitness to the sexual battery—could have provided testimony that would have changed the outcome of his trial. To the extent Petitioner alleges that Mr. Parker could have provided a "conspiracy theory" based on the absence of the boat prior to Petitioner's trial, the trial court's finding that the boat was for sale before April 4, 1999, is fully supported by the record and contradicts Petitioner's speculation that the boat was sold to cover-up evidence or otherwise further a conspiracy to falsely accuse or wrongfully convict Petitioner.[23]

Therefore, the state court decision denying Petitioner's claim was not contrary to or an unreasonable application of <u>Strickland</u>, and Petitioner is not entitled to federal habeas relief on this claim.

G.    Ground Seven:  "Counsel failed to investigate and call George Mall as a witness."

Petitioner contends that he gave his counsel the name, address, and phone number of George Mall, "a witness who saw Petitioner at home during the time of the alleged offense," but counsel failed to investigate Mr. Mall and thereby deprived Petitioner of the right to a fair trial (Doc. 1 at 5F). Respondent concedes that the claim was exhausted in the state courts, noting that it was presented as Issue Eleven in Petitioner's Rule 3.850 motion (Doc. 10 at 2, 22).

1.    Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel was set forth *supra*.

2.    Federal Review of State Court Decision

---

[23] Although the trial court additionally determined, without conducting an evidentiary hearing, that Petitioner's counsel apparently made a strategic decision to forgo investigating the boat, the court need not decide whether the finding is erroneous because the trial court's other findings on Petitioner's claim are sufficient for this court to conclude that the trial court's reasoning and findings were not contrary to or an unreasonable application of <u>Strickland</u>.

The state court identified <u>Strickland</u> as setting forth the controlling legal standard for analyzing ineffective assistance of counsel claims (Ex. T at 34–36). In the written order denying Petitioner's claim the state court found as fact that counsel investigated Mr. Mall, as evidenced by counsel's filing of a witness list listing Mr. Mall as a potential defense witness and the State's deposing of Mr. Mall, a transcript of which was part of the record before the trial court (Ex. T at 47; *see also* Ex. T, Attach. 5 (Mr. Mall's deposition transcript)). Moreover, the trial court concluded, Petitioner did not appear to be prejudiced by his counsel's failure to call Mr. Mall as a witness based upon a review of Mr. Mall's deposition testimony (*see* Ex. T at 47–48).

Petitioner has failed to present clear and convincing evidence to rebut the trial court's factual findings; therefore, they are presumed correct. Moreover, the record confirms the trial court's findings. It is evident that the State became aware of Mr. Mall as a potential defense witness because the State took his deposition (*see* Ex. T, Attach. 5). Additionally, at his deposition Mr. Mall testified that he lived with Petitioner's mother, Ms. Bowen, and lived with her during the time frame relevant to Petitioner's case (*see* Ex. T, Attach. 5 at 4). However, although Mr. Mall testified that he could "swear on the bible" he never "saw nobody go on the boat as far as - - because I was down there every night. Just about every night down on that beach," Mr. Mall admitted that he had no specific recollection of events during Easter of 1999, the relevant time frame (*see id.* at 9–10).

Based on the foregoing facts, it was not unreasonable for the trial court to conclude: 1) that counsel did not perform deficiently because Mr. Mall was, in fact, investigated; and 2) that Petitioner was not prejudiced by counsel's failure to call him as a witness at trial. Mr. Mall's testimony was unhelpful due to his lack of memory, and other witnesses testified to the same facts Petitioner wished to bring forward through the testimony of Mr. Mall; namely, that Petitioner was at home during the time of the alleged offense. Accordingly, the state court decision denying Petitioner's claim was not an unreasonable application of <u>Strickland</u>.

    H.    <u>Ground Eight: "Counsel failed to request the trial court to read back to the jury parts of transcripts that would answer the jury's question."</u>

Petitioner asserts that the jury sent written questions to the trial court during their deliberations concerning whether Petitioner's prior convictions involved sexual offenses and were the result of "separate trials or just separate counts" (Doc. 1 at 5G). The jury additionally inquired

whether Investigator Nix ever directly asked T.A. if there were any other witnesses to the sexual encounter, and if he did not ask her that question, why he failed to ask the question (*id.*). Petitioner contends his counsel performed deficiently with regard to the jury's questions by failing to ask the trial court to read back "parts of [the trial] transcripts that were relevant to their decision of guilt or innocence," and that he was prejudiced by counsel's failure to do so because "probably, due to the weakness of the State's evidence, [Petitioner] would not have been found guilty" (*id.*). Respondent concedes that this claim was exhausted in the state courts, noting that it was presented as Issue Fourteen in Petitioner's Rule 3.850 motion (Doc. 10 at 2, 23).[24]

  1.  Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel was set forth *supra*.

  2.  Federal Review of State Court Decision

As previously noted, the state court identified <u>Strickland</u> as setting forth the controlling legal standard for analyzing ineffective assistance of counsel claims (Ex. T at 34–36). In the written order denying Petitioner's claim the state court found that the testimony Petitioner contends should have been read back to the jury would not have answered the actual question asked by the jury and, therefore, counsel did perform deficiently by failing to seek a read-back of the testimony (*id.* at 52).

A review of the relevant trial proceedings is necessary to the resolution of Petitioner's claim. During the jury's deliberations the trial judge advised the parties that he had received two questions from the jury, and the following exchanges occurred:

THE COURT: [The jury's] questions read: One, was any of [Petitioner's] prior convictions sexually related? And, secondly, were [Petitioner's] prior felony convictions separate trials or just separate counts.

I think – I don't know how those should be answered, but I'll hear from you in any event, before we call the jury back in and I answer those questions.

---

[24] The court notes, however, that in the Rule 3.850 motion Petitioner made no mention of the jury's questions regarding his prior convictions; his claim related only to trial counsel's failure to request a read-back of the testimony in response to the jury's question about Investigator Nix's questioning of T.A. (*see* Ex. T at 25–27).

MS. PATTERSON [the prosecutor]:  Go ahead, Clinton [Couch, defense counsel].

MR. COUCH:  Your Honor, it's the position of the Defense that the Court should instruct the jury that it is not their concern - - the questions they've raised are not of their concern, that they need only recognize that those were eight felony convictions.

THE COURT:  Ms. Patterson?

MS. PATTERSON:    I would like the Court to answer them honestly, but I know that the Court can't do that.[25]  So I agree that the - -

THE COURT:  What I plan to do is just tell them that they cannot consider any matters other than what's been presented in evidence, and therefore, I cannot answer those questions specifically or directly.  Then I'm going to read them jury instruction 3.10 that says, essentially, the evidence that you have received that the defendant has been convicted of prior offenses should be considered by you only in weighing the credibility of the defendant's testimony and not for any other purpose.
I'm just going to reemphasize that to them.  That's on page 68.  I think that's appropriate.

(Ex. C at 306–07).  The judge then answered the jury's questions in the manner he had discussed with the parties (*see id.* at 309).  The jury presented a third (two-part) question to the judge; namely, "Did the investigator ever directly ask [T.A.] if there were any other witnesses?  If not, why?" (*id.* at 309–10).  The judge then stated to the parties at a bench conference that, "I obviously can't answer that one either" and asked whether the parties agreed with his assessment (*id.* at 308). Defense counsel stated that he agreed the question could not be answered (*id.*).  The jury was then instructed as follows:  "Again, I can't comment on matters in evidence or not in evidence.  You can only consider those matters presented to you and collectively call on your powers of recollection in that regard.  So, again, you'll have to - - I cannot answer that question for you." (*id.* at 310).

---

[25] The prosecutor was apparently referring to Petitioner's previous convictions for committing a lewd and lascivious act in the presence of a child when he was seventeen and sexual battery on a child less than twelve years of age when he was seventeen (*see, e.g.*, <u>Veach v. State</u>, 614 So. 2d 680, 680–81 (1993); Doc. 10 at 3 n.3 & n.6).

Case No. 3:06cv482/MCR/EMT

Initially, it appears that Petitioner's instant claim for relief concerns only the jury's third question, because the sole trial testimony relevant to the jury's first and second questions was Petitioner's testimony that he had previously been convicted of eight felonies. A read-back of that testimony would not have been helpful to Petitioner and clearly would not have resulted in an acquittal; furthermore, it would not have answered the jury's questions, and it was not raised as an issue in Petitioner's Rule 3.850 motion.

Thus, turning to the jury's third question, Petitioner has not identified the testimony he claims his counsel should have asked to have read back to the jury, but in the Rule 3.850 motion he identified the trial testimony of Investigator Nix in support of his claim (Ex. T at 25–27). The undersigned's review of the trial transcript reveals that the only testimony relevant to the jury's third question is that of Investigator Nix. Therefore, the undersigned will review his testimony in considering Petitioner's claim. Before doing so, and to put Investigator Nix's trial testimony in perspective, it is important to note that defense counsel became aware that the prosecutor objected to some of the testimony defense counsel wished to elicit by recalling Investigator Nix. Therefore, immediately prior to his recall, defense counsel presented a live proffer of his testimony outside the presence of the jury (*see* Ex. C at 205–09). During the proffer, in relevant part, Investigator Nix was asked "what did [T.A.] say that [Petitioner] said to her immediately before the assault allegedly occurred" (*id.* at 207). In response, Investigator Nix stated that Petitioner "[a]sked [T.A.] to give him and [C.A.] some privacy and to leave the boat" (*id.*). After hearing the proposed testimony of Investigator Nix, the trial court agreed to permit his testimony, the jury was returned to the courtroom, and Investigator Nix testified before the jury during his recall as follows:

> MR. COUCH: Officer Nix, during your investigation of this case, you interviewed [T.A.]?
>
> INV. NIX: Yes.
>
> MR. COUCH: Okay. During that interview, she described to you where this alleged incident took place?
>
> INV. NIX: Yes sir, she did.
>
> MR. COUCH: What did she tell you?

INV. NIX:      She told me that it occurred on Athens Avenue inside a boat.

MR. COUCH: Okay.  And where did she indicate to you that the boat was located on the property?

INV. NIX:      At the address where she was staying.

MR. COUCH: Okay.  And in your report, where did you indicate that she had told you that the boat was located on the property?

INV. NIX:      It says in my report that it was located in the yard.

MR. COUCH: Okay. [T.A.] also told you that immediately prior to this incident occurring that [Petitioner] made a statement to her.  What sort of statement did she say that [Petitioner] made?

INV. NIX:      That he asked her and a friend that was with her to leave and give him and [C.A.] some privacy.

MR. COUCH: In your report, did you indicate that he had made a statement to her and her friend?

INV. NIX:      I just read that and I may be taking that from what the question you asked me prior to - -

MR. COUCH: Okay.  If I could approach the witness, Your Honor?

THE COURT: Yes.

INV. NIX:      - - this line of questioning.

MR. COUCH: I ask you to review your report and see if it refreshes your memory as to whether or not [T.A.] had made any reference to another person being there with her that may have observed [Petitioner] and her sister.

INV. NIX:      Right.  Say that again.  I was reading.

MR. COUCH: Does your report indicate that [T.A.] had told you about the presence of another party besides herself, her sister [C.A.], and [Petitioner]?

INV. NIX:      No.

MR. COUCH: Okay. So, she did not tell you that Christopher observed this when you took her initial statement?

INV. NIX: No.

(*id.* at 209–11). On cross-examination, in relevant part, the following exchange occurred:

MS. PATTERSON: At the time [you interviewed T.A.] do you recall whether you asked [T.A.] if anyone else was present?

INV. NIX: I don't recall having a conversation with her.

MS. PATTERSON: Okay. When was it that the name of Chris first came up?

INV. NIX: I believe during the interview with [C.A.] is when I first found out about Chris.

Petitioner has failed to present clear and convincing evidence that the trial court's factual finding—that a read-back of Investigator Nix's testimony would not have answered the jury's questions—was unreasonable. Part one of the jury's third question specifically asked whether Investigator Nix "ever directly ask[ed] T.A. if there were any other witnesses," but Investigator Nix was not asked that question on direct examination.[26] Rather, Investigator Nix was asked about a specific statement made by T.A. that he included in his offense report.[27] As the trial court found, the testimony would not have answered the jury's question regarding whether T.A. was <u>ever</u> asked about the presence of other witnesses. The testimony would have merely demonstrated that T.A.'s trial testimony regarding the presence of other witnesses differed from the earlier statement she provided to Investigator Nix.

Likewise, Investigator Nix's testimony on cross-examination would not have answered the first part of the jury's question. Investigator Nix was asked by the prosecutor whether, during his interview of T.A., he recalled asking T.A. if anyone else was present. It is evident from a review

---

[26] Investigator Nix's testimony on cross-examination will be discussed *infra*.

[27] It is evident that defense counsel asked this question because he expected Investigator Nix to testify as he had during the proffer, which would have impeached the trial testimony of T.A. However, Investigator Nix did not testify as he had during the proffer; instead, he indicated that T.A. stated that Petitioner asked her "and a friend that was with her" to leave. Therefore, defense counsel referred Investigator Nix to his offense report, which contained the statement of T.A. as related during the proffer, and he then testified as he had during the proffer.

Case No. 3:06cv482/MCR/EMT

of the transcript, quoted *supra*, that the "interview" referred to by the prosecutor was the same interview discussed during defense counsel's direct examination of Investigator Nix.  Thus, the prosecutor's question concerned only whether T.A. was asked about other witnesses during that interview, not whether she was "ever" asked.  Moreover, even if the prosecutor's question is construed more broadly, that is, as a question asking whether T.A. had ever been asked about the presence of other witnesses, Investigator Nix's response to the question was that he did not "recall having a conversation with [T.A.]."  Thus, the jury's question would not have been answered by a read-back of Investigator Nix's testimony.  Similarly, the second part of the jury's question would not have been answered by a read-back, because it called for an answer only if the answer to the first part of the question was "no."  As previously explained, no trial testimony provided any answer to the first part of the question, much less a negative answer or response.  Therefore, Petitioner has not shown "clearly and convincingly" that the trial court's finding was "based on an unreasonable determination of the facts in light of the evidence presented in the State court."  Jones, 496 F.3d at 1228; 28 U.S.C. §§ 2254(d)(2), (e)(1).

Accordingly, the state court decision denying Petitioner's claim, based on a finding that "counsel cannot be deemed ineffective for failing to make a request which would not have answered the jury's question" (Ex. T at 52), was not an unreasonable application of Strickland.

I.      Ground Nine: Trial court denied cross-examination of prosecution witness against Petitioner.

Petitioner asserts that the trial court denied his constitutional rights by limiting defense counsel's cross-examination of Ms. Culver (Doc. 1 at 5H).  Specifically, Petitioner contends that the trial court wrongfully prohibited cross-examination concerning Ms. Culver's "filing of complaints against two other persons after her relationships with them ended," which would have called into question her credibility and demonstrated that she "had engaged in a pattern of conduct whereby she made complaints against men with whom she had a relationship, but only after the relationships ended" (*id.* at 5H–5I).  Respondent concedes that this claim was exhausted in the state courts, noting that it was presented as Issue One in Petitioner's direct appeal (Doc. 10 at 2, 26).

1.      Clearly Established Supreme Court Law

"In all prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. A primary interest secured by the Confrontation Clause is the opportunity for cross-examination. *See* Crawford v. Washington, 541 U.S. 36, 41–42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); Olden v. Kentucky, 488 U.S. 227, 231, 109 S. Ct. 480, 483, 102 L. Ed. 2d 513 (1988); Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974); Kentucky v. Stincer, 482 U.S. 730, 736, 107 S. Ct. 2658, 2662, 96 L. Ed. 2d 631 (1987); United States v. Williams, 837 F.2d 1009, 1015 (11th Cir. 1988). "Exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis, 415 U.S. at 316–17 (citing Greene v. McElroy, 360 U.S. 474, 496, 79 S. Ct. 1400, 1413, 3 L. Ed. 2d 1377 (1959)). Defense counsel must be able "to make a record from which to argue why [a witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318. He must be "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.*

The defendant's right to cross-examine witnesses is not without limitation, however. He is entitled to only an opportunity for effective cross-examination, not cross-examination "in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 294, 88 L. Ed. 2d 15 (1985) (per curiam); United States v. Beale, 921 F.2d 1412, 1424 (11th Cir. 1991). "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986); *see also* United States v. Bennett, 928 F.2d 1548 (11th Cir. 1991); Francis v. Dugger, 908 F.2d 696 (11th Cir. 1990). "[W]here the witness sought to be cross-examined is the government's 'star' witness, providing an essential link in the prosecution's case, the importance of full cross-examination to disclose possible bias is necessarily increased." United States v. Lankford, 955 F.2d 1545, 1548 (11th Cir. 1992). Thus, the discretion of a trial judge to limit cross-examination is more narrowly circumscribed in such cases. *See* De Lisi v. Crosby, 402 F.3d 1294, 1301 (11th Cir. 2005) (citation omitted).

Cross-examination is constitutionally adequate as long as a defendant is permitted to elicit sufficient information from which (1) the jury can gauge credibility, motive, and bias and (2) his counsel is able to argue to the jury how the witness might have been biased. United States v. Van Dorn, 925 F.2d 1331, 1335 (11th Cir. 1991); United States v. Sellers, 906 F.2d 597, 602 (11th Cir. 1990); Bundy v. Dugger, 850 F.2d 1402 (11th Cir. 1988). The standard in reviewing a limitation upon cross-examination is whether "the excluded testimony would have given the jury a different impression of the witness' credibility." United States v. DeParias, 805 F.2d 1447, 1452 (11th Cir. 1986).

The right to present a defense through confrontation and cross-examination of witnesses is also guaranteed by constitutional principles of due process. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses . . . have long been recognized as essential to due process." See Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

Analysis of whether constitutional error occurred during trial does not end the inquiry, however. Error involving the conduct of trial is grounds for federal habeas relief only if it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637–38, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d 353 (1993) (quoting Kotteakos v. United States, 328 U.S.750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 2d 1557 (1946)). Because the erroneous exclusion of evidence occurred "during the presentation of the case to the jury, [the error can be] quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial." Brecht, 507 U.S. at 629 (internal citations and quotation marks omitted). Should the court's limitation of cross-examination constitute error, such error may be harmless depending upon the following five factors: (1) how important the witness's testimony was to the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. See Van Arsdall, 475 U.S. at 684; United States v. Mills, 138 F.3d 928 (11th Cir. 1998).

"[W]here a judge, in a habeas proceeding, applying this standard of harmless error, is in grave doubt as to the harmlessness of an error, the habeas petitioner must win." California v. Roy, 519 U.S. 2, 5, 117 S. Ct. 337, 338, 136 L. Ed. 2d 266 (1996). The Supreme Court has defined grave doubt as, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." O'Neal v. McAninch, 513 U.S. 432, 435, 115 S. Ct. 992, 994, 130 L. Ed. 2d 947 (1995).

2. Federal Review of State Court Decision

Petitioner raised this claim in the direct appeal of his conviction. The First DCA affirmed the conviction per curiam. Although the state court denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable. See Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326–27 (11th Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

The trial transcript reflects that the parties sought a ruling from the trial court, prior to the State's calling of Ms. Culver as a witness, regarding defense counsel's expected cross-examination (Ex. B at 116–17). Specifically, the prosecutor advised the court that defense counsel wanted "to get into the fact that in the past [Ms. Culver] has made a complaint against two former spouses, neither of which she tells me are related to . . . [Petitioner's] family, for battery/domestic violence," and defense counsel's aim was to "show that this is another in her long line of complaints against people" (id. at 117). The prosecutor stated, however, that Ms. Culver was "not a complainant in this case," but rather a witness to a statement made by Petitioner, and that any testimony regarding her earlier complaints was irrelevant (id.). Defense counsel then asserted that Ms. Culver had "become a witness or complaining witness against [] two previous gentlemen when that relationship [sic] soured and ended," and that similarly, once her relationship with Petitioner ended "she came forward to testify that she was an admission or confession witness" (id. at 117–18). Defense counsel argued that the proposed cross-examination was therefore "relevant to impeach [her] credibility" (id.).

The trial court ruled as follows:

Well, looking at the broad definition of relevancy under 401, it says relevant evidence is evidence tending to prove or disprove a material fact. Even giving it that

Page 47 of 60

> liberal interpretation, I don't find that these prior events involving other individuals would be relevant.
>
> Certainly, you can delve into the fact that she had a previous relationship with Mr. Veach and it may not have ended on good terms. But getting into these prior relationships involving other individuals, one, I don't deem to be relevant. And secondly, under 90.403, tends to be so remote as to - - that any relevance it might have would tend to substantially outweigh and be prejudicial and confusing to the trier of fact. So, the Court bases it's ruling two-fold; one, that under 90.401, it would not be relevant. And if it were relevant, under 90.403, it should be excluded.

(*id.*).

Consistent with the trial court's ruling, defense counsel refrained from cross-examining Ms. Culver about the prior complaints (*see id.* at 122–23). The following relevant facts, however, were elicited from Ms. Culver (on direct examination or cross-examination, or both): 1) Ms. Culver became involved in a romantic relationship with Petitioner in May 1999 and began living with Petitioner at that time; 2) she became aware of the allegations against Petitioner in May 1999; 3) she confronted Petitioner about the allegations in May 1999 (at which time Petitioner admitted that "he had slept with a little girl" on a boat by his mother's house); 4) she allowed Petitioner to continue living in her residence for two or three weeks following his admission and did not report his admission to law enforcement while he was living with her; 5) Petitioner left town after the two to three weeks he had resided with Ms. Culver; 6) Ms. Culver did not report Petitioner's admission to law enforcement until after Petitioner left town; and 7) Ms. Culver was not involved with Petitioner at the time of Petitioner's trial (*id.*).

Based on the foregoing, the undersigned concludes that the cross-examination was constitutionally adequate. The jury was able to gauge Ms. Culver's credibility by considering that she allowed Petitioner to continue residing with her in her home for several weeks after learning of the allegations against Petitioner, and more important, allowed Petitioner to continue residing with her after he admitted that the allegations were true. Similarly, the jury was able to gauge Ms. Culver's motive or bias by considering that Ms. Culver did not report Petitioner's admission to law enforcement until after Petitioner was no longer residing with her and had "left town." Moreover, defense counsel argued in closing arguments that Ms. Culver was not credible or unbiased. For example, defense counsel argued that after Petitioner's alleged confession, "[Ms. Culver] took him

back into her home, back into her bed, for another two weeks, until he left her and moved out of town.  Then she decided this information I needed to pass on to law enforcement." (Ex. C at 280–81).  Counsel further argued that Ms. Culver was "merely a spurned lover willing to say anything to get back at a man who didn't want her anymore" (*id.* at 281).  Counsel's arguments, supported by Ms. Culver's testimony, quite effectively called into doubt the truthfulness of her testimony, and this court cannot conclude that the excluded testimony (that is, complaints of domestic violence against her by two former spouses or romantic partners) "would have given the jury a different impression" of her credibility.  DeParias, 805 F.2d at 1452.  Furthemore, Ms. Culver was not the prosecution's "star witness," such that the importance of a full cross-examination to disclose possible bias was increased.  Lankford, 955 F.2d at 1548.

The clearly established Supreme Court law, as interpreted by the Eleventh Circuit, makes it clear that a trial judge has wide latitude to limit cross-examination based on a finding, as the trial court did here, that the proposed line of questioning is not relevant or is only marginally relevant. Furthermore, because the state court record establishes that the trial court's limitation had no "substantial and injurious effect or influence in determining the jury's verdict," Brecht, 507 U.S. at 637–38, the state court's denial of Petitioner's Sixth Amendment claim was not contrary to or an unreasonable application of Supreme Court law, and Petitioner is not entitled to federal habeas relief.  J.     Ground Ten:  "Prosecutor made improper comments in closing argument [which] constituted fundamental error."

Petitioner contends that the prosecutor's comments during closing arguments were "impermissible because they improperly asked the jury to use its determination of who was telling the truth," Petitioner or C.A. and T.A., "as the test for deciding if Petitioner was guilty and thus distorted the State's burden of proof" (Doc. 1 at 5I–5J).  Similarly, Petitioner contends it was improper "to lead the jury to believe that the defendant has the burden of proving his innocence" (*id.* at 5J).  Respondent states that the claim was presented in the state courts, noting that it was presented as Issue Three in Petitioner's direct appeal (Doc. 10 at 15).  Respondent contends, however, that Petitioner failed to fairly present the federal nature of his claim to the state courts, and he is now procedurally barred from attempting to do so (*id.* at 30–33).  Respondent alternatively argues that the claim is without merit (*id.* at 33–36).

With regard to the issue of procedural default, Respondent contends that Petitioner's insertion of the Fifth Amendment in the styling of the issue in the initial brief on direct appeal (but "otherwise unseen in the initial brief") did not "properly raise the claim or bring it to the attention of the state courts," noting that Petitioner's entire argument in the body of the brief was based on state law (Doc. 10 at 30).  In his reply, Petitioner contends that he fairly presented a constitutional claim below by citing Gore v. State, 719 So. 2d 1197 (Fla. 1998) and other cases; by arguing that the prosecutor impermissibly shifted the burden of proof, a "classic Fifth Amendment violation"; and by including the Fifth Amendment reference in the style of the issue, which was sufficient to alert the state court to the federal nature of his claim (noting that he is "unaware of any rule or authority that requires the basis of a claim be repeated be repeated over and over throughout the argument") (Doc. 16 at 8–10).

Upon review of the state court record, the undersigned concludes that Petitioner fairly presented his federal claim in the state courts.  In his initial appellate brief, Petitioner styled Issue Three (in two different sections of the brief) as follows:

> WHETHER IMPROPER COMMENTS OF THE PROSECUTOR IN CLOSING ARGUMENT CONSTITUTED FUNDAMENTAL ERROR, DEPRIVING [PETITIONER] OF HIS RIGHTS UNDER SECTION 9, ARTICLE I, CONSTITUTION OF THE STATE OF FLORIDA, AND THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES.

(Ex. K at i, 36) (emphasis added).  In the body of the brief Petitioner cited numerous state cases in support of the claim, including Clewis v. State, 605 So. 2d 974 (Fla. 3d DCA 1992); Gore, 719 So. 2d at 1197; Caraballo v. State, 762 So. 2d 542, 547 (Fla. 5th DCA 2000); and Cochran v. State, 711 So. 2d 1159 (Fla. 4th DCA 1998) (id. at 21–23, 36–40).  Although Petitioner did not cite any federal cases, in Gore the court cited Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935) in discussing a prosecutor's obligation to refrain from improper argument (albeit in the context of inflammatory and sarcastic comments as opposed to comments that mislead the jury as to the burden of proof).  See Gore, 719 So. 2d at 1200–02.  Likewise, Petitioner cited Clewis, wherein the court cited (among other cases) United States v. Stanfield, 521 F.2d 1122, 1125 (9th Cir. 1975); United States v. Reed, 724 F.2d 677, 681 (8th Cir. 1984); and United States v. Vargas, 583 F.2d 380, 387 (7th Cir. 1978) in discussing whether the State shifted the burden of proof to the

defense during closing arguments by arguing that to acquit the defendant the jury would have to believe the defendant's testimony over the testimony of police officers. Clewis, 605 So. 2d at 974. *See also* Caraballo, 762 So. 2d at 546 (citing federal cases in discussing impermissible comments on the evidence, such as commenting on matters not in evidence and expressing personal opinions on the merits of the case or the credibility of witnesses); Cochran, 711 So. 2d at 1163 (citing Berger, 295 U.S. at 88). Thus, while "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so," Baldwin, 541 U.S. at 27, here Petitioner styled the claim as a claim arising under the Fifth Amendment of the United States Constitution, in addition to citing cases that discuss federal law. Thus, the undersigned concludes that Petitioner fairly presented his claim below. *See id.* at 32 ("[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'") (emphasis added).

The undersigned will thus determine whether the state court decision denying Petitioner's claim was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

            1.        Clearly Established Supreme Court Law

The Supreme Court declared in In re Winship that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970). Additionally, the Supreme Court has held that a defendant does not have to disprove anything nor prove innocence, and state created presumptions to the contrary are violative of due process. *See* Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979); Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L. Ed. 2d 508 (1975). The Eleventh Circuit, in recognizing the government's burden and obligation of proving guilt beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof. *See* Duncan v. Stynchcombe, 704 F.2d 1213, 1216 (11th Cir. 1983).

A prosecutor's improper statements to the jury, however, do not alone justify habeas relief. United States v. Young, 470 U.S. 1, 11–12, 105 S. Ct. 1038, 1044, 84 L. Ed. 2d 1 (1985). "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied: (1) the prosecutor's comments must have been improper, and (2) the comments must have rendered the trial fundamentally unfair. *See* United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991) (citations omitted); Brooks v. Kemp, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S. Ct. 3325, 92 L. Ed. 2d 732 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987).

In considering whether improper comments rendered a trial fundamentally unfair, the court "must determine whether the improper comments 'were so egregious as to create a reasonable probability that the outcome was changed because of them.'" Cargill v. Turpin, 120 F.3d 1366, 1379 (11th Cir. 1997) (citing Brooks, 762 F.2d at 1403). "A 'reasonable probability' is one sufficient to undermine confidence in the outcome." *Id.* (citing Wilson v. Kemp, 777 F.2d 621, 623 (11th Cir. 1985)). "If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair." *Id.* (citing Tucker v. Kemp, 802 F.2d 1293, 1296 (11th Cir.1986)).

In applying this standard, a reviewing court should not assess prosecutorial comments in isolation, "shorn of their context," but must examine the entire context of the trial proceeding. Cargill, 120 F.3d at1379 (citing Brooks, 762 F.2d at 1413). "In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity." *Id.* (internal quotation and citation omitted). The court may also consider the lack of an objection in examining the impact of a prosecutor's statements, "as the omission 'may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging.'" *Id.* (quoting Brooks, 762 F.2d at 1397 n.19). Furthermore, the court should evaluate whether "defense counsel's closing argument . . . ameliorate[d] the damage done to the defense by the prosecutor's [statements]." *Id.* (citations omitted). Moreover, the court must consider the trial court's instructions to the jury, as they "may

remedy effects of improper comments." *Id.* (internal quotation and citation omitted). Finally, the court must consider the evidence of guilt. *Id.* (internal quotation and citation omitted). Where the evidence against the accused is very strong, in order to merit relief, prosecutorial misconduct would have to be even more egregious and pervasive than in cases where the evidence is less compelling, for example, where the defendant has a viable defense. *See id*; Brooks, 762 F.2d at 1415–16.

2.      Federal Review of State Court Decision

Petitioner raised this claim in the direct appeal of his conviction. The First DCA affirmed the conviction per curiam. Although the state court denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable. *See* Helton, 233 F.3d at 1326–27; Delgado, 223 F.3d at 982; Hannon, 109 F.3d at 335.

The trial transcript reflects that the prosecutor made the following closing arguments relevant to the instant claim (and, the most relevant comments appear in bold below):

> **This case comes down to a credibility question for you. Who are you going to believe; 13 year old [C.A.] and her 11 year old sister; or 28 year old John - - Felice John Veach. That is a decision that you're going to have to make.**
> . . . .
>
> In weighing the evidence the Judge will instruct you that you are to decide what evidence is reliable. You should use your common sense in deciding which is the best evidence and which evidence should not be relied upon in considering your verdict. You may find some of the evidence not reliable or less reliable than other evidence.
>
> You should consider how the witnesses acted as well as what they said. Some of the things you should consider are: Did the witness seem to have an opportunity to see and know the things about which the witness testified? Did the witness seem to have an accurate memory? Was the witness honest and straightforward in answering the attorney's questions? Did the witness have some interest in how the case should be decided? Does the witness' testimony agree with the other testimony or other evidence in the case? Did the witness at some time make a statement that's inconsistent with his testimony in court? And was it proved that the witness had been convicted of a crime?
> . . . .
>
> Now, in this case, the State's case, you heard the first version of the events; that from [C.A.] and [T.A.]. First you heard from their mother . . . .

(Ex. C at 257–58).

The prosecutor then discussed some of the trial testimony of Ms. Smith and T.A. (*id.* at 258–59). And with regard to T.A., the prosecutor stated:

> You should weigh her credibility as an 11-year-old child. Her demeanor, how sincere she seemed, how straightforward, whether you could detect any - -

> anything in her manner that would tell you based on your common sense that she wasn't telling the truth. And then you can also rely on the lack of evidence impeaching her. There was no evidence of reputation of her nontruthfulness. There was no evidence of why she would have any motive to make this up or lie about this. There was no evidence controverting what she had to say, other than the denial. So you should weigh her credibility and what she had to say.

(*id.* at 259–60).

The prosecutor made a similar statement regarding C.A.'s testimony, noting that C.A.'s credibility would also have to be evaluated, and arguing that C.A. had no reason to make up an allegation against Petitioner, and her testimony had not been controverted by the evidence, other than Petitioner's denial "that it happened at all" (*id.* at 260–62). As to Ms. Culver's testimony, the prosecutor asserted that she had no motive to fabricate, except possibly Ms. Culver's break-up with Petitioner, but she asserted that a breakup would not motivate someone to commit perjury (*id.* at 263–64). The prosecutor next discussed the testimony of the defense witnesses and pointed out inconsistencies in their testimony and identified reasons why some defense witnesses were biased or had an interest in the outcome of the case (*see id.* at 264–67). In contrast, the prosecutor argued that the testimony of the State's witnesses was largely consistent, and none of the State's witnesses had a criminal record (*id.* at 268–69). The prosecutor concluded as follows:

> Do the victims have an interest in the outcome of the case? Is their life going to be changed by your verdict? I would submit other than what they feel personally, no. Is the defendant's life going to be changed by this verdict? Is his family's life going to be changed? I would consider they have a much elevated interest in the outcome of this case than they do - - than the victim's family does. Those are things that you can and should consider.
>
> The way the law is set up, the State - - because it has the burden of proof – proceeds first, then Mr. Couch has an opportunity to address you, and then the State is allowed . . . a rebuttal argument . . . .

(*id.* at 269–70).

Defense counsel then presented his closing argument, during which he reminded the jury <u>four times</u> that the State had the burden to prove their case beyond and to the exclusion of every reasonable doubt (*see id.* at 277, 285, 286).

Next, the prosecutor made the following relevant statements in rebuttal:

> First of all, [the Judge] is not going to instruct you that if you have a doubt you should find him not guilty. He's not going to instruct you if you have unsure

feelings, you should find him not guilty. What the Judge is going to instruct you is if you have a reasonable doubt, one that is - - that if you have a doubt that is - - your conviction wavers and vacillates and you're not sure, that may be a reasonable doubt. But unsure feelings are not a doubt. And a simple doubt is not a reasonable doubt. And that is the State's burden.

The State doesn't have to prove the case to the extent that you know what happened. And the Judge is not going to instruct you that you need to know what happened to reach your verdict. **Only two people know what happened. That's [C.A.] and Rocky Veach. And you've heard their testimony today. You have to decide which of these two people you are going to find more credible, who you're going to believe.**

(*id.* at 286–87) (emphasis added). The prosecutor then addressed certain arguments made by defense counsel in his closing argument and attempted to demonstrate why his arguments were not persuasive (*see id.* at 287–88). The prosecutor also argued that it was not reasonable to believe that T.A. and C.A. "made the whole thing up," involved their mother in the lie, and took it "this far" (*id.* at 288). And in conclusion the prosecutor stated, "I urge you to listen to the Judge, follow the law. And if you do and you reasonably assess the evidence, that you will find you have no reasonable doubt, the defendant did commit these crimes and that your verdict should be one of guilty as charged." (*id.* at 296).

The judge then instructed the jury as to the elements of each offense (*id.* at 296–98) and continued as follows:

The defendant has entered a plea of not guilty. This means you must presume or believe the defendant is innocent. The presumption stays with the defendant as to each material allegation in the information through each stage of the trial unless it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt.

To overcome the defendant's presumption of innocence, the State has the burden of proving the crime with which the defendant is charged was committed, and the defendant is the person who committed the crime. The defendant is not required to present evidence or to prove anything.

Whenever the words reasonable doubt are used, you must consider the following: A reasonable doubt is not a mere possible doubt, a speculative, imaginary, or forced doubt. Such a doubt must not influence you to return a verdict of not guilty if you have an abiding conviction of guilt.

On the other hand, if after carefully considering, comparing, and weighing all of the evidence there is not an abiding conviction of guilt, or if having a conviction it is one which is not stable but one which wavers and vacillates, then the charge is not proved beyond every reasonable doubt and you must find the defendant not guilty because the doubt is reasonable.

It is to the evidence introduced in this trial and to it alone that you're to look for that proof. A reasonable doubt as to the guilt of the defendant may arise from the evidence, conflict in the evidence, or the lack of evidence. If you have reasonable doubt, you should find the defendant not guilty. If you have no reasonable doubt, you should find the defendant guilty.

It is up to you to decide what evidence is reliable. You should use your common sense in deciding which is the best evidence and which evidence should not be relied upon in considering your verdict.

You may find some of the evidence not reliable or less reliable than other evidence. You should consider how the witnesses acted as well as what they said.

(*id.* at 298–300). Next, the judge instructed the jury regarding the factors they should consider in weighing the credibility of witnesses, which were largely the same as those factors identified by the prosecutor in her initial closing argument to the jury (*see id.* at 258, 300–01). And after articulating the factors, the judge stated:

You may rely upon your own conclusion about the witness. A juror may believe or disbelieve all or any part of the evidence of the testimony of any witness.

The defendant in this case has become a witness. You should apply the same rules to consideration of his testimony of the other witnesses.

(*id.* at 301).

In resolving Petitioner's claim, it is helpful to review the facts and results in other cases where a similar "burden shifting" claim was raised. In United States v. Vargas, 583 F.2d 380, 387 (7th Cir. 1978), the prosecutor "explained at length that there were sharp, unavoidable differences in the [trial] testimony, so that somebody must be lying"; emphasized the testimony of five Drug Enforcement Administration ("DEA") agents; and explained if the defendant was believed, each of the five DEA agents must have lied. The prosecutor additionally told the jury that if the defendant was found not guilty, "I want you to write on there [presumably the verdict form] that all of those people lied. [DEA Agent] Ricevuto is a liar. [DEA Agent] Garcia is a liar. [DEA Agent] Collins is a liar. [DEA Agent] Kowalski is a liar. [DEA Agent] Fanter is a liar." *Id.* The jury was further

advised by the prosecutor that their "other alternative . . . was a verdict of guilty." *Id.* The court concluded that the prosecutor's arguments were improper because the jury did not have to believe that the DEA agents lied in order to convict the defendant, and similarly, that telling the jury that they had to choose between two stories was error. *Id.* (citing Stanfield, 521 F.2d at 1122). *See also* United States v. Cantu, 876 F.2d 1134 (5th Cir. 1989) (improper to equate not guilty verdict with a finding that agents lied); United States v. Hurtado-Olivero, 24 F.3d 240 (5th Cir. 1994) (same).

In Stanfield, the court noted that it is improper to suggest to the jury that "their duty was to decide the case only by determining which of the two sets of purported facts was true." Stanfield, 521 F.2d at 1126. The court explained that the test is not "which side is more believable, but whether, taking all of the evidence in the case into consideration, guilt as to every essential element of the charge has been proven beyond a reasonable doubt." *Id.* at 1125.

Additionally, in United States v. Diaz-Carreon, 915 F.2d 951, 956 (5th Cir. 1990), the prosecutor argued as follows:

> Ladies and gentlemen, what this case comes down to is one thing. The credibility that you are going to give the witnesses that testified. And it's like a balance. You're either going to believe the Defendant and you're going to disbelieve everyone else, or you're going to believe other people and you're going to disbelieve the Defendant. And that's all it comes down to.

In declining to reverse Mr. Diaz-Carreon's conviction, the Fifth Circuit noted that when the prosecutor's comments were considered in context, it was evident that the comments had only a limited prejudicial effect, and noted as follows:

> The prosecutor's remarks followed a heated attack by Diaz-Carreon's counsel on the credibility of the customs agents who testified for the Government. The prosecutor correctly (if perhaps inartfully) noted that witness credibility was a critical issue in the case against Diaz-Carreon. Then, following the questionable comments, the prosecutor attempted to demonstrate that the Government witnesses were more credible than the defense witnesses. At no point did the prosecutor inform the jury the facts it *must* find in order to reach a certain verdict—indeed, the prosecutor expressly disavowed that he had a prerogative to do so. Rather, the prosecutor's apparent intent was (1) to inform the jury simply that it was likely to believe the witnesses of one side at the expense of the other side's witnesses, and (2) to suggest that the Government witnesses were the witnesses the jury could find most believable. In this light, such a suggestion was not impermissible.

*Id.* at 957 (footnote omitted). The court also noted that throughout closing argument the prosecutor acknowledged that he had the burden of proving guilt beyond a reasonable doubt (*id.* at 957 n.8).

The court further noted that its case differed in "one significant-and dispositive-detail from" <u>Vargas</u>; namely, that in <u>Vargas</u> "the prosecutor expressly informed the jury that it could acquit only if it disbelieved the Government witnesses," whereas in its case the "questionable prosecutorial remark was much more ambiguous." *Id.* at 956–57 n.8; *see also* <u>United States v. Marshall</u>, 75 F.3d 1097, 1108 (7th Cir. 1996) (distinguishing its facts from those in <u>Vargas</u>, noting that its "jury was not presented with stark, bright-line, and absolute alternatives that might serve to distort the burden of proof").

The undersigned concludes that the facts of the instant case are most closely analogous to those in <u>Diaz-Carreon</u>. Although in the instant case defense counsel did not appear to present a "heated attack" on C.A. or T.A.'s credibility, the defense theory was that they were not telling the truth. Thus, their credibility (and Petitioner's) was the central theme in Petitioner's trial. The prosecutor, therefore, was permitted to note that witness credibility was a critical issue. Furthermore, the prosecutor's statement, that "This case comes down to a credibility question for you. Who are you going to believe; 13 year old [C.A.] and her 11 year old sister; or 28 year old John - - Felice John Veach," was made at the beginning of her initial closing argument, after which she attempted to demonstrate that the State's witnesses were more credible than the defense witnesses. Moreover, the prosecutor did not expressly inform the jury that it could acquit <u>only if</u> it disbelieved the State's witnesses, and she advised the jury more than once that the State had the burden of proof. Thus, the prosecutor's remarks do not appear to have impermissibly shifted the burden of proof.

However, even if the prosecutor's remarks are deemed improper,[28] the undersigned concludes that the remarks did not "'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden</u>, 477 U.S. at 181. Initially, the remarks here are far less egregious than those that specifically state that to acquit the jury must correspondingly find that the State's witnesses are liars, as in <u>Cantu</u>, 876 F.2d at 1134 and <u>Hurtado-Olivero</u>, 24 F.3d at 240, or that to acquit the jury might as well indicate on the verdict form that the prosecution's witnesses

---

[28] Although the prosecutor did not expressly inform the jury that it could acquit only if it disbelieved the State's witnesses, the prosecutor stated in rebuttal that, "Only two people know what happened. That's [C.A.] and Rocky Veach. And you've heard their testimony today. You have to decide which of these two people you are going to find more credible, who you're going to believe." (Ex. C at 287).

are liars, as in <u>Vargas</u>, 583 F.2d at 387. Thus, there is no reasonable probability that that the outcome of Petitioner's trial was changed, as the less flagrant remarks here had only a limited prejudicial effect, if any. Additionally, defense counsel did not object to the prosecutor's remarks, suggesting his belief that the remarks were not overly damaging, despite how they may appear in the trial record, and defense counsel advised the jury four times during his closing argument that the State had the burden of proof. Furthermore, the trial court cured any prejudice from a suggestion that anyone but the State had the burden of proof by clearly instructing the jury on the following points: (1) to convict Petitioner, the State was required to prove the elements of each crime beyond a reasonable doubt, (2) Petitioner was not required to present evidence or prove anything, (3) if the jury had a reasonable doubt as to whether Petitioner committed the offenses, they should find him not guilty, (4) a reasonable doubt as to guilt could arise from the evidence, conflict in the evidence, or lack of evidence, and (5) it was the jury's duty to decide what evidence was reliable (Ex. C at 298–300). Lastly, the evidence against Petitioner was strong, as it included the testimony of the victim, an eyewitness, and a witness to whom Petitioner had confessed, and Petitioner's defense, which included conflicting testimony of interested parties, some with numerous felony convictions, was not viable.

Thus, because the state court record establishes that the prosecutor's comments, if deemed improper, had no "substantial and injurious effect or influence in determining the jury's verdict," <u>Brecht</u>, 507 U.S. at 637–38, the state court's denial of Petitioner's Fifth Amendment claim was not contrary to or an unreasonable application of Supreme Court law, and Petitioner is not entitled to federal habeas relief.

VI.     CONCLUSION

Petitioner has failed to establish any meritorious claim for relief. Therefore, his  habeas petition should be denied.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Walter McNeil is substituted for James McDonough as Respondent.

And it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

At Pensacola, Florida, this 21st day of October 2009.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**